Eurena J. **WELLS**, Plaintiff–Appellee,

v.

The NEW **CHEROKEE CORPORATION**, Defendant–Appellant.

Nos. 93–6563, 94–5030.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 19, 1995.

Decided June 23, 1995.

234

David A. Burkhalter, II (argued and briefed), Burkhalter & Windle, Knoxville, TN, for plaintiff-appellee.

Fred W. Suggs, Jr. (argued and briefed), Stephen F. Fisher (briefed), Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for defendant-appellant.

Before: ENGEL, NORRIS, and DAUGHTREY, Circuit Judges.

ENGEL, Circuit Judge.

This case presents several issues arising under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* After losing to the employee in a jury trial, the defendant brought this appeal challenging the sufficiency of the evidence, the evidentiary status of an age-related comment, the jury's grant of front pay, and the attorney's fee award. We reject the employer's claims and therefore affirm.

The plaintiff, Eurena J. Wells, began working for New Cherokee in 1965, and other than one break for maternity leave, she worked for New Cherokee continuously until she was fired on June 12, 1992, at the age of fifty. She held various jobs within the corporation at different times, including spinner and industrial engineering clerk, the job she held in 1990. At that time she had a good reputation at work, and there were no complaints about her performance. In 1990, however, she was directed to train a 28 year old employee, Leshia Rhodes, to do her job. This training took four weeks, and at the end of that time, Wells was told that her position had been "eliminated" and that the employer would have to let her go. After Wells complained of age discrimination to the president of New Cherokee, however, the Plant Controller, Kent Merritt, transferred her to a position as a switchboard operator. Wells had various difficulties in this position, including two incidents involving checks mailed out unsigned and others mailed several days late. A few months after these incidents, a year and a half after her transfer, Wells was fired for poor performance.

Wells then brought this action against her employer alleging that she was fired because of her age. After a jury trial, she was awarded $17,956.50 in back pay, $68,663.00 in front pay, and attorney's fees. New Cherokee had moved for summary judgment and then judgment as a matter of law both before and after the verdict was returned, and now it appeals, claiming that it is entitled to a verdict in its favor or, in the alternative, a new trial.

## I.

New Cherokee argues first that it is entitled to judgment as a matter of law because Wells presented insufficient evidence to support the verdict. This Circuit has held that in reviewing a ruling permitting or denying judgment as a matter of law in age discrimination cases, we need not examine whether the plaintiff made out a prima facie case. We may assume that she did and move on to the ultimate question of whether Wells carried her burden of persuasion that New Cherokee violated the ADEA. *Brownlow v. Edgecomb Metals, Co.,* 867 F.2d 960, 963 (6th Cir.1989) The ADEA provides that employers may not "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Thus Wells must present sufficient evidence to prove "that age was a determining factor in the adverse action that the employer took against . . . her." *Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993) (citation omitted).

New Cherokee should receive judgment as a matter of law only if, "viewing the evidence and reasonable inferences therefrom in the light most favorable to [the plaintiff] and without considering the credibility of the witnesses or the weight of the evidence, the only reasonable conclusion is a verdict against [the plaintiff]." *Roush v. KFC Nat'l Management Co.,* 10 F.3d 392, 395 (6th Cir.1993). This Circuit has acknowledged that "there is no fixed, easy formula to prove the circumstances of the discrimination. . . . Such claims generally involve nebulous, circumstantial evidence, but our review must begin somewhere." *Phelps,* 986 F.2d at 1023 (citations omitted).

New Cherokee contends that it fired Wells for poor performance, while Wells argues that she would have been transferred, not fired, had she been younger. She also claims that New Cherokee's age discrimination began in 1990, when she was told that her job in industrial engineering would be eliminated and that she would be let go. Her supervisor in that position had no complaints about her work, and New Cherokee does not sug-

gest that she was unqualified for that position. Yet she was directed to train 28–year-old Rhodes to perform most of the tasks required by her clerical position before it was "eliminated." She was transferred to the switchboard rather than being fired only after she complained to the president of New Cherokee that she felt that this represented age discrimination. At trial, New Cherokee presented evidence that Rhodes computerized the tasks which Wells had trained her to do, but it does not appear that New Cherokee ever considered Wells for the "new" post, even though she had seniority over her replacement. Rhodes transferred from the switchboard to the "new" post created by the elimination of Wells' job, while Wells replaced Rhodes as a switchboard operator. Any action based on this transfer is time-barred, but Wells may offer New Cherokee's earlier conduct as evidence of its motivation for eventually firing her. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Mathewson v. National Automatic Tool Co.,* 807 F.2d 87, 91 (7th Cir.1986).

Wells also presented evidence that the switchboard position was hectic, unpleasant and often used as an entry-level post from which operators were transferred when other positions became available. Rhodes had been a switchboard operator and had asked to be transferred from that position before she took over Wells' responsibilities. Wells did not like the position, and asked several times to be moved to another job, as Rhodes and others were. The Plant Controller, Kent Merritt, told her that no other jobs were open even though he switched another operator into Accounts Payable, filled two other clerical positions with new employees, and hired three new employees as spinners, a post Wells had held before and was qualified to perform. All six positions were filled by employees much younger than Wells. New Cherokee claims that Merritt and Mike Sharp, Wells' supervisor, looked for another clerical position for her but found only one open. They explained that they did not offer this job to Wells because it would have required her to work on Sunday. Wells had expressed a preference not to work Sundays, but she testified that she never refused to do

so, she had worked Sundays in the past, and she would have done so again rather than being fired.

Although Wells admits to some difficulties during her year and a half as a switchboard operator, at trial the parties hotly disputed the extent of Wells' trouble. The switchboard position demanded an assortment of skills, from handling calls corporation-wide to preparing and mailing out corporate checks. When given the position, Wells received only a few days' training from Rhodes, despite the variety of duties involved. Several witnesses testified at trial that Wells failed to relay messages properly, cut off callers, and was generally not a good operator. Wells replied that one of five untrained stand-ins handled the switchboard for at least an hour and a half every day, so problems could be attributed to others as easily as to Wells. Moreover, the president of the corporation and several other operators testified that most operators had the same problems.

Wells did, however, make two important mistakes involving the corporation's checks. One time, the checks were placed on her desk after being verified, but before being signed, and she mailed between 50 and 100 checks without signatures. All but one or two cleared without trouble, although one supplier objected strongly. On another occasion, just after New Cherokee changed the check-mailing procedure to leave checks in the vault, Wells forgot them, then sent them out several days late.

New Cherokee had a progressive disciplinary policy involving counseling and written warnings before firing an employee for cause, but it did not follow this procedure in Wells' case. Sharp spoke to Wells about the incidents with the checks, telling her that they must not happen again, but he made no written reprimand. Wells continued to handle the checks for three or four months after these incidents, and the employer continued to add to her responsibilities, until June of 1992, when she was fired for being unfit for the position. Wells was replaced as switchboard operator by a 24–year–old new hire, who was generally qualified and well-educated but had no experience as a switchboard

operator. At that time not a single written reprimand of any sort appeared in Wells' personnel file. She was also never verbally reprimanded in the months between the check incidents and her termination, but she testified that in May, shortly before firing her, Sharp told her that she was "too old to do the job" and that a "younger person could do more" than she could. These statements present direct evidence that Sharp exhibited age-based prejudice, and circumstantial evidence that Wells was fired "because of" her age.

New Cherokee offered strong evidence that Wells was not a good switchboard operator, and it argues that this evidence compels judgment in its favor. Without question, a jury could find that New Cherokee fired Wells for poor performance. If Wells had tried only to prove that she was well-qualified for the switchboard position, New Cherokee would probably merit judgment as a matter of law.

Wells' evidence is not so limited, however. She offered evidence on most disputed questions, and drawing all permissible inferences from Wells' evidence in her favor, the jury *could* find the following facts. First, New Cherokee discriminated against Wells in 1990, when it gave her duties to a much younger employee and transferred her to the switchboard. Second, younger operators shared Wells' difficulties on the switchboard, but were treated differently. Third, Merritt and Sharp filled positions for which Wells was qualified with young employees, then lied about having tried to find a position for Wells. Fourth, Sharp displayed discriminatory bias against Wells because of her age when he told her that she was "too old to do the job" and that a "younger person could do more than" she could. New Cherokee argues that an isolated comment cannot suffice to support the verdict, but again, Sharp's age-related comments are not alone. They are buttressed by Wells' other evidence. We express no opinion on the truth of Wells' allegations, but we disagree with New Cherokee's assertion that no jury could reasonably find that Wells was fired because of her age. New Cherokee "made a powerful case; presented with conflicting evidence, however,

the jury chose to accept [Wells']. Credibility determinations are for the jury." *Wheeler v. McKinley Enterprises,* 937 F.2d 1158, 1162 (6th Cir.1991).

**II.**

■ New Cherokee argues that because Merritt, not Sharp, had the authority to fire Wells, Sharp's age-related comment does not constitute evidence of age discrimination by New Cherokee. It insists that we remand for a new trial because the district court failed to give the following jury instruction offered by New Cherokee: "[B]efore you may find that a statement tends to prove that Cherokee discriminated against Ms. Wells because of her age, you must first find that the person who allegedly made the statement was the same person who made the ultimate decision to discharge Ms. Wells." New Cherokee bases the proposed instruction on the following passage from *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1161 (6th Cir.1990):

> McDonald argues that certain remarks made by his direct supervisor, Chris Bakaitis, indicate a clear case of age bias. Assuming arguendo that Bakaitis was, in fact, predisposed to age discrimination, McDonald's argument is, nevertheless, without merit. McDonald was fired by Bakaitis' supervisor, Carl Raglin, and Bakaitis' discriminatory remarks are not attributable to Raglin. This circuit has held that a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official.

New Cherokee asserts that this case is indistinguishable from *McDonald.* Mike Sharp, who made the statement about Wells' age, was her immediate supervisor, but he did not independently have the authority to fire her; Kent Merritt did. Thus the relevant question seems to concern not Sharp's possible age bias but Merritt's, since if Sharp did not fire her, he cannot have fired her on the basis of her age, even if he did have an age-based prejudice against her.

However, Wells points out that unlike the supervisor in *McDonald,* Sharp was involved

in the decision to fire her. The testimony was convincing that Sharp and Merritt worked closely together and consulted with each other on personnel decisions. Sharp and Merritt themselves testified that they acted jointly. Sharp explained that *"We were removing her for job performance,"* and Merritt stated that *"We decided that . . . she could not stay on the switchboard."* (Emphasis added.) Sharp, not Merritt, prepared and signed the termination report. Whatever the formal hierarchy of New Cherokee might be, plainly Sharp contributed significantly to the decision, so his motivations are relevant to the question whether Wells was fired because of her age.

We do not believe that the *McDonald* rule was ever intended for so formalistic an application as New Cherokee proposes. If we applied the rule rigidly, employers could simply create a post for the manager in charge of firing employees and isolate that person so that he or she never met the unlucky employees. Supervisors with no official authority to discharge would effectively make firing decisions before informing this manager, who would then act on the decisions, and the employer would not be liable even if the supervisors admitted discrimination. Companies may not so easily insulate themselves from liability for discriminatory discharges. Instead, courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee. The district court did not err in refusing to give New Cherokee's proposed jury instruction.

### III.

■ New Cherokee contends that the district court erred by refusing to determine if an award of front pay was appropriate before submitting the damages issue to the jury. It relies on *Roush v. KFC Nat'l Management Co.,* 10 F.3d 392 (6th Cir.1993), in which this court recognized that although determination of the amount of a front pay award is a jury question, "determination of the propriety of an award of front pay is a matter for the court." *Id.* at 398. The court held, "The district court's determination of whether an award of front pay is appropriate, must ordinarily precede its submission of the case to the jury." *Id.* at 398–99.

Here, the district court rejected New Cherokee's motion asking the court to reserve for itself the decision of whether Wells should receive an award of front pay. The court stated that it would decide whether New Cherokee must reinstate Wells, but that "damages, including the propriety of, and amount of future lost wages will be determined by the jury." New Cherokee renewed its objection prior to submission of the case to the jury, and the court again held that it would let the jury decide the issue of whether front pay was appropriate. New Cherokee now contends that allowing the jury to determine the propriety of front pay was error as a matter of law which entitles it to a new trial.

We agree with New Cherokee that the district court erred in letting the jury decide the propriety of a front pay award. We recognize that the district court explicitly held that reinstatement was not appropriate. This holding by itself was insufficient, however. A plaintiff who is not entitled to reinstatement is not automatically entitled to an award of front pay. *Roush,* 10 F.3d at 398.

■ On the facts of this case, however, we conclude that the error was harmless. One of the primary concerns of the *Roush* court was that the district court properly instruct the jury on how to determine the amount of front pay awards. *Id.* at 399 (the need to instruct the jury on what factors to consider in determining the amount of front pay is "the most obvious reason why" the court must state the reasons for why such an award is or is not appropriate before submitting the damages issue to the jury). In *Roush,* the court's failure to address the issue "resulted in the jury being given virtually no guidance in determining the amount of the front pay award." *Id.* at 400.

Here, by contrast, the court specifically instructed the jury on what factors to consider in setting the amount of the award. New Cherokee did not object to this instruction. Thus, a central problem in *Roush* is absent here. Moreover, unlike *Roush,* where "the

record simply [did] not support an award of front pay," *id*, overwhelming evidence establishes that Wells is entitled to such an award. Upon this record we would have been obliged to hold that any other conclusion was error.

The district court should have determined the propriety of front pay and stated the reasons for this determination. The error was harmless, however, and does not entitle New Cherokee to a new trial or any other relief.

## IV.

Wells submitted a motion under 29 U.S.C. § 626(b) seeking attorneys' fees with a requested increase by a factor of 1.75. The court granted the motion for fees but denied the increase because of a recent change in the law to prohibit such multiplication. *See Davis v. Mutual Life Insurance Co.*, 6 F.3d 367, 381 (6th Cir.1993). New Cherokee argues that the court's order must be reversed because, it claims, the court failed to state findings of fact and Wells failed to provide sufficiently specific proof of her counsels' hourly rate.

This Circuit has held that district courts should make their findings regarding attorneys' fees a part of the record, because without a clear record, "Such awards may well constitute an abuse of discretion while rendering the award virtually unreviewable." *Northcross v. Board of Educ.*, 611 F.2d 624, 636 (6th Cir.1979). This court reviews the entire fee award for an abuse of discretion, *Perotti v. Seiter*, 935 F.2d 761, 763 (6th Cir. 1991), and "[a] district court has broad discretion to determine what constitutes a reasonable hourly rate for an attorney." *Wayne v. Village of Sebring*, 36 F.3d 517, 533 (6th Cir.1994). The district court here did not state any findings, but issued a two-page Memorandum and Order accepting Wells' counsels' hours and hourly rates and denying the increase. New Cherokee argues that *Northcross* requires a remand for further fact-finding.

▮ In this case, however, New Cherokee limited its challenge to Wells' attorneys' hourly rate, calling it excessive and arguing that Wells' affidavits did not properly estab-

lish it as a reasonable rate. New Cherokee did not offer opposing affidavits, though it did propose alternate methods for establishing a reasonable rate. Under these circumstances, we accept the district court's ruling, although we observe that the district court should more properly have explained its reasons for accepting Wells' hourly rate.

New Cherokee cites a case from the D.C. Circuit requiring considerable specificity in affidavits supporting attorneys' rates, and on the strength of that case it argues that Wells' affidavits were too vague to support the award. *See Nat'l Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1325–26 (D.C.Cir.1982). We note first that this Circuit has not adopted that case's more demanding standards for fee affidavits. While more information is always useful, *Northcross* directed courts to look first at the attorneys' ordinary rate.

> In determining what the level of compensation for each category of service should be, the court should look to the fair market value of the services provided. In most communities, the marketplace has set a value for the services of attorneys, and the hourly rate charged by an attorney for his or her services will normally reflect the training, background, experience and skill of the individual attorney. For those attorneys who have no private practice, the rates customarily charged in the community for similar services can be looked to for guidance. . . . This does not mean that the routine hourly rate charged by attorneys is the maximum which can or should be awarded. In many cases that rate is not "reasonable," because it does not take into account special circumstances, such as unusual time constraint, or an unusually unpopular cause, which affect the market value of the services rendered.

611 F.2d at 638.

▮ Wells submitted two affidavits with her petition for attorney's fees. In the first, her attorneys listed their hours, described their work, provided their background and experience and stated their hourly fee. In the second affidavit, a local practitioner with considerable experience in the field of antidiscrimination law stated that he had re-

viewed the litigation and the attorneys' fees and that they were reasonable for the jurisdiction. We find this information adequate for the district court to make an informed decision in accepting the attorneys' hourly rates and awarding them fees based on those rates. We reject New Cherokee's suggestion that the district court should have used a rate found by averaging the fees awarded in only four allegedly similar cases over a period of four years. New Cherokee's proposed rule defining a reasonable rate contradicts the district court's wide discretion to determine attorney's fees on a case-by-case basis. "[T]here is nothing in *Northcross* to prevent a district judge from adjusting a fee upward or downward to reflect the quality of representation.... We defer to the district court's judgment on such matters because, unlike an appellate court which is not well situated to assess the quality of counsel, the district court judge closely monitors the litigation on a day-to-day basis and is in close contact with counsel." *Louisville Black Police Officers Organization, Inc. v. Louisville*, 700 F.2d 268, 276–77 (6th Cir.1983). The district court did not abuse its discretion in awarding fees at the attorneys' stated rates.

### V.

For the stated reasons, we AFFIRM.