Michael WILLIAMS,

and

Maudie Williams, Plaintiffs,

v.

**UNITED DAIRY FARMERS,**
**et al., Defendants.**

Nos. C2:96CV00802, C2:96CV01060.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 18, 1998.

Reginald Alpha Cooke, Cooke & Associates, Columbus, OH, Renny Joe Tyson, Renny J. Tyson Co., Columbus, OH, F. Benjamin Riek, III, Riek & Associates, Cleveland, OH, for Michael A. Williams.

Larry Holliday James, Crabbe Brown Jones Potts & Schmidt, Columbus, OH, Brian Paul Gillan, Jerry Sylvester Sallee, Dinsmore & Shohl, Cincinnati, OH, for United Dairy Farmers.

Brian Paul Gillan, Jerry Sylvester Sallee, Dinsmore & Shohl, Cincinnati, OH, for J.D. Caudill, Glen Broersma.

**OPINION AND ORDER**

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Defendants' Motions for Summary Judgment. Plaintiffs Maudie and Michael Williams bring this action against Defendants, United Dairy Farmers ("UDF"), Bill Bales, Glenn Broersma, J.D. Caudill, and Richard Gray, alleging violations of their rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981 (" § 1981"), and state law claims for discrimination under Ohio Revised Code § 4112 and breach of contract. For the reasons set forth below, Defendants' Motions for Summary Judgment are **GRANTED** in part and **DENIED** in part.

### II. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs Maudie and Michael Williams, mother and son, respectively, were employed by Defendant United Dairy Farmers, Inc. ("UDF") at its store located on 1531 Frebis Avenue, Columbus, Ohio ("Store 611"). Maudie began working at Store 611 on March 15, 1994, while Michael began on May 25, 1994. Prior to her termination, Maudie was promoted twice—once to Shift Leader on April 18, 1994, then to Assistant Manager on December 26, 1994.

Much of this lawsuit centers around the factual allegations made by Michael and Maudie regarding the working atmosphere at Store 611. Plaintiffs allege that Defendants Glenn Broersma and Bill Bales, District Supervisors for UDF, created a working environment which was hostile to African-American employees. At the time of their employment, Plaintiffs were the only African-American employees at Store 611. Defendants Bales and Broersma, deny all allegations and remarks attributed to them.

Plaintiffs allege that Bales and Broersma conducted a racially motivated campaign to have them fired. Plaintiffs contend that Bales and Broersma did so by asking Debbie Ferguson, the store manager, and Patricia

Munyan, the assistant store manager, to issue disciplinary write-ups on the Plaintiffs "for anything and everything as a way to get them fired." Ferguson and Munyan aver that during Plaintiffs' period of employment, Bales and Broersma did not request such a high level of scrutiny for any other employees at Store 611.

Plaintiffs allege that the campaign of Bales and Broersma was rooted in racial animus against African–Americans. Both Bales and Broersma allegedly instructed Ferguson and Munyan not to hire any more "fucking niggers." Also, Bales and Broersma are alleged to have made racially derogatory comments regarding African–American patrons at the store.

While Plaintiffs were discharged for the same reason—violating UDF's cash handling policy—the facts surrounding each plaintiff's termination meeting differ slightly.

## A. The Termination of Maudie Williams

Maudie received disciplinary write-ups for violating UDF's cash handling procedures on four occasions: (1) July 20, 1994 ($51.08 short on the cash register); (2) September 15, 1994 ($41.83 short on the cash register); (3) January 27, 1995 ($100.52 over on the gasoline receipts); and (4) February 2, 1995 ($50.00 short on the bank deposit).

Sometime in late February, 1995, Defendant Dick Gray, a Zone Manager for Defendants UDF, invited Maudie to the Columbus UDF corporate offices. The original purpose of the meeting was to discuss the process which would eventually lead to Maudie owning a store, the Management Program. After extending the invitation to Maudie, Gray contacted Bales to inform him of the upcoming meeting. Upon learning of this meeting, Bales allegedly went to Store 611 to collect cash register receipts to demonstrate that Maudie had violated the store's overring policy. Bales allegedly asked Munyan to assist him in gathering the "evidence," but Munyan testified that she refused because she knew what Bales was doing was wrong. Bales allegedly told Munyan that "Maudie Williams thinks she's going up to corporate headquarters for a job promotion, but she's really going to get fired."

On March 6, 1995, Bales drove to the UDF corporate offices in Columbus to present the results of his "investigation" to Gray and J.D. Caudill, Manager of Security for UDF. Upon arrival at corporate headquarters, Gray asked Maudie to meet with Caudill. During the meeting, Caudill asked Maudie whether the cash register receipts compiled by Bales were hers, to which Maudie responded that she could not identify the markings on the receipts. Caudill asked Maudie whether she overrang certain items in order to make the overall register receipts balance, to which Maudie responded in the negative. Caudill then asked Maudie to write a statement regarding the overring incident. Maudie admits that she composed the first paragraph of the statement, but alleges that the second was a transcription of what Caudill told her to write. Maudie did not consider the statement to be an admission of any wrongdoing. After the statement was signed, Caudill left the room to talk with Gray. Both men returned, and Gray informed Maudie that her employment was terminated.

Until Maudie's discharge on March 6, 1995, store manager Debbie Ferguson was allegedly unaware that Maudie had violated the overring policy. Bales testified, however, that Ferguson prepared the daily cash receipts ledger which he used to investigate Maudie's alleged overrings. Bales also testified that Ferguson prepared such reports in the ordinary course of her business duties.

## B. The Termination of Michael Williams

Michael received disciplinary write-ups on five occasions: (1) July 20, 1994; (2) August 29, 1994; (3) August 30, 1994; (4) September 15, 1994; and (5) November 1, 1994. After the November write-up, UDF alleges that Michael was observed "violating the cash handling procedure", by putting money in the register without ringing up an item of sale.

On January 18, 1995, Caudill asked Michael to meet with him at the UDF Columbus corporate offices. Michael understood that the purpose of the meeting was to answer questions about a sexual harassment claim unrelated to his alleged cash handling violations. Caudill conducted a security in-

terview with Michael, asking him various questions ranging from involvement in theft of property or money to violations of the cash handling procedure. Michael answered "no" to all theft questions. When asked whether he recalled ever putting money in the cash register without ringing up an item sale, Michael answered that it was "possible" he had done so. According to his affidavit, Michael qualified his "possible" answer by explaining that the only time he might have done so was when the store was busy and an impatient customer left money on the counter without telling him what item was purchased. Michael explained to Caudill that he had been taught that UDF policy dictated that he secure the money in the register and not ring up a fabricated item sale. Caudill then asked (or demanded) that Michael put that explanation down in writing. Michael wrote the following statement:

> When I work alone I sometimes put money in the register and [sic] without ringing it up when I work alone and it is busy.

Michael then left the UDF corporate offices. Later, Gray contacted Michael and informed him of his discharge.

### C. Authority to Hire and Fire

Dick Gray is the Zone Manager for UDF, and testified that he alone has the authority to fire employees. Glenn Broersma and Bill Bales, District Supervisors for Store 611, reported directly to Gray. Bales replaced Broersma as a District Supervisor in January, 1995. According to Bales and Broersma, only Gray possessed the power to hire and fire employees. Ferguson and Munyan, however, state Bales and Broersma "were involved in all issues concerning the hiring and firing of employees," and "had the power to get an employee fired."

J.D. Caudill, the Manager of Security for UDF, reports directly to Gray. Caudill testified that he does not possess the authority to fire an employee. Ferguson, however, avers that Caudill had the authority to fire an employee.

Finally, Debra Ferguson avers in her affidavit that she was usually involved in all decisions regarding the hiring and firing of Store 611 employees, and that she did the hiring and firing of the employees at the store. She also states that the firings of Maudie and Michael were "unique" in that she had no involvement in the final disciplinary actions.

### D. Procedural Posture of the Case

Both Plaintiffs have asserted claims under Title VII and § 1981. Maudie also has a state claim under Ohio Rev.Code § 4112, which is the state law equivalent of Title VII, while Michael has a state law claim for breach of contract. This matter is before the Court on Defendants' Motion for Summary Judgment.

## III. DISCUSSION AND ANALYSIS

### A. Standard for Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995).

## B. The Plaintiffs' Prima Facie Case Under Title VII

Title VII provides, in pertinent part:

■ It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000E–2(a). As an initial matter, the Title VII claims against the individual Defendants—Bales, Broersma, Caudill, and Gray—must be dismissed as a matter of law. The Sixth Circuit has held that individuals who do not otherwise qualify as an "employer" cannot be held individually liable under Title VII. *Wathen v. General Electric Co.*, 115 F.3d 400, 403–06 (6th Cir.1997). "Employer," under Title VII, is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..." 42 U.S.C. § 2000e(b). Because the individual defendants do not qualify as "employers," the Court hereby **GRANTS** Defendants' Motions for Summary Judgment as to the Title VII claims against Bales, Broersma, Caudill, and Gray.

■ A plaintiff can establish a *prima facie* case of discrimination under Title VII in one of two ways: direct evidence or circumstantial evidence. *Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Direct evidence is evidence which, if believed, proves the existence of improper discrimination animus without inference or presumption. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997); *Rollins v. TechSouth Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987). Circumstantial evidence, on the other hand, creates a presumption that some illegitimate factor, such as race or gender, played a role in an employer's decision making process. *McDonnell Douglas*, 411 U.S. at 800–02, 93 S.Ct. 1817.

The issue before the Court is whether Plaintiffs' evidence, in particular the alleged remarks and disciplinary campaign initiated by Bales and Broersma, constitute direct evidence of racial animus under Title VII. This Court finds that the evidence falls squarely within the definition of direct evidence as set forth by the Supreme Court and the Sixth Circuit.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) the Plaintiff was a female senior manager who was proposed for partnership. Based on written evaluations and comments of the other partners, the Plaintiff's candidacy was held for reconsideration the following year. *Id.* at 231–32, 109 S.Ct. 1775. The next year, the partners refused to re-propose or reconsider the Plaintiff for partnership, which led to the filing of her claim. *Id.*

The record before the Court contained the written evaluations and comments of the partners, some of which demonstrated that the Plaintiff had been a victim of sexual stereotyping. For example, one partner suggested the Plaintiff "overcompensated for being a woman"; another objected to her use of profanity "because it's a lady using foul language." *Id.* at 235, 109 S.Ct. 1775. Perhaps the most telling comment was the suggestion

that the Plaintiff "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.*

In *Price Waterhouse*, the Supreme Court first addressed the issue of the required causal relationship between the evidence of discrimination and the adverse employment decision under Title VII:

> Congress' intent to forbid employers to take gender into account in making employment decisions appears on the face of the statute. In non-familiar language, the statute forbids an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate with respect to his compensation, terms, conditions, or privileges of employment, or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex. We take these words to mean that gender must be irrelevant to employment decisions. To construe the words because of as colloquial shorthand for but-for causation, as does Price Waterhouse, is to misunderstand them.

\*   \*   \*   \*   \*   \*

> The critical inquiry, the one commanded by the words of § 703(a)(1), is whether gender was a factor in the employment decision at the moment it was made. Moreover, since we know that the words because of, do not mean solely because of, we also know that Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore, an employer considers both gender and legitimate factors at the time of making a decision, that decision was because of sex and the other, legitimate considerations—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account.

\*   \*   \*   \*   \*   \*

> We need not leave our common sense at the doorstep when we interpret a statute. It is difficult for us to imagine that, in the simple words because of, Congress meant to obligate a plaintiff to identify the precise causal role played by legitimate and illegitimate motivations in the employment decision she challenges. We conclude, instead, that Congress meant to obligate her to prove that the employer relied upon sex-based considerations in coming to its decision.

*Id.* at 239–42, 109 S.Ct. 1775 (footnotes omitted).[1]

Based on this interpretation, the Supreme Court affirmed the trial court's finding that the remarks of the partners found in the partnership evaluations constituted "specific proof" that the decision not to promote the plaintiff was motivated, in part, by gender considerations based upon sexual stereotyping. *Id.* at 250–52, 109 S.Ct. 1775. The Court declined, however, to adopt a bright-line rule for determining when remarks constitute evidence of discrimination under Title VII:

> Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be evidence that gender played a part. In any event, the stereotyping in this case did not simply consist of stray remarks. On the contrary, Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way dis-

---

1. This interpretation was later codified by Congress in § 107 of the 991 Civil Rights Act. *See* 42 U.S.C. § 2000E–2(m). Section 107 also overruled the portion of *Price Waterhouse* which held that employers could avoid liability in mixed motive cases by demonstrating that the same adverse employment decision would have been made in the absence of the discriminatory motive. *See Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302, 1306 n. 9 (N.D.Cal.1992).

claimed reliance on the sex-linked evaluations. This is not, as Price Waterhouse suggests, discrimination in the air; rather, it is, as Hopkins puts it, discrimination brought to ground and visited upon an employee. By focusing on Hopkins' specific proof, however, we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision, and we refrain from deciding here which specific facts, standing alone, would or would not establish a plaintiff's case, since such a decision is unnecessary in this case.

*Id.* at 251–52, 109 S.Ct. 1775.[2] Thus, the Supreme Court in *Price Waterhouse* specifically left open the issue of ways in which a plaintiff could demonstrate the required causal relationship between alleged discriminatory remarks and the adverse employment decision.

The Sixth Circuit has adopted the "meaningfully involved" standard for determining when the remarks of an intermediate supervisor constitute direct evidence of discrimination under Title VII. In *Wells v. New Cherokee Corp.*, 58 F.3d 233 (6th Cir.1995), the plaintiff brought a claim of age discrimination against her employer.[3] The defendant in *Wells* argued that the discriminatory remarks of an intermediate level supervisor, who did not possess the authority to fire the plaintiff, were not direct evidence of discrimination. *Id* at 237. There was evidence, however, that the intermediate level supervisor consulted with the Defendant's ultimate decision maker on personnel decisions, and prepared and signed the Plaintiff's termination report. *Id.* at 238. Despite the fact that the supervisor did not possess firing authority, the Sixth Circuit found "[w]hatever the formal hierarchy of the employer might be, plainly [the supervisor] contributed significantly to the decision, so his motivations are relevant to the question whether [plaintiff] was fired because of her age." *Id.*

■ Defendants rely on *McDonald v. Union Camp Corp.*, 898 F.2d 1155 (6th Cir.1990) for the proposition "a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." *Id.* at 1166. The Sixth Circuit in *Wells*, however, rejected any suggestion that *McDonald* was intended as a bright-line rule:

We do not believe that the *McDonald* rule was ever intended for so formalistic an application as New Cherokee proposes. If we applied the rule rigidly, employers could simply create a post for the manager in charge of firing employees and isolate that person so that he or she never met the unlucky employees. Supervisors with no official authority to discharge would effectively make firing decisions before informing this manager, who would then act on the decisions, and the employer would not be liable even if the supervisors admitted discrimination. Companies may not so easily insulate themselves from liability for discriminatory discharges. Instead, courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee. The

**2.** During oral arguments, Defendants relied heavily on a narrow interpretation of "direct evidence" defined by Justice O'Connor in her concurring opinion. This Court, however, is not persuaded by Defendants interpretation of Justice O'Connor's concurrence for two reasons. First, Justice Brennan, writing for the plurality, unequivocally stated "we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision, and we refrain from deciding here which specific facts, standing alone, would or would not establish a plaintiff's case, since such a decision is unnecessary in this case."

Second, Justice O'Connor's definition of "direct evidence" was not intended to exclude circumstantial evidence which, as part of a causal chain, demonstrates that discriminatory animus played a role in an employer's decision.

*See Thomas v. National Football League Players Assn.*, 131 F.3d 198, 204 (D.C.Cir.1997) ("Justice O'Connor's invocation of 'direct' evidence is not intended to disqualify circumstantial evidence nor to require that the evidence signify without inference.")

**3.** Both the Supreme Court and the Sixth Circuit have recognized the close relationship between Title VII and the ADEA. *See Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Coger v. Board of Regents of the State of Tennessee, et al.*, 1998 WL 476164 (6th Cir. Aug.17, 1998).

district court did not err in refusing to give New Cherokee's proposed jury instruction. *Wells,* 58 F.3d at 238. Thus, per *Wells* the pertinent inquiry for a court, when faced with evidence of alleged discriminatory remarks by an intermediate level supervisor, is whether that supervisor is, or was, "meaningfully involved" in the termination decision.[4]

■ In the matter before this Court, the issue is therefore whether Bales and Broersma were "meaningfully involved" in the termination decision. On the record before this Court, the Plaintiffs have adduced sufficient evidence to demonstrate that Bales and Broersma were "meaningfully involved" in the termination decision. While it may or may not be true that only Gray possessed the authority to hire or fire employees, there is evidence in the record which indicates that Bales and Broersma, at a minimum, participated in creating the record upon which Gray relied in arriving at his termination decision. For example, Bales allegedly drove to corporate headquarters on the morning of March 6, 1995, to deliver various materials which indicated violations of UDF's cash handling policy by Maudie. These materials, compiled by Bales, provoked Gray's decision to terminate Maudie's employment. Also, like the intermediate level supervisor in *Wells,* Bales signed the termination documents for both Plaintiffs. Thus, because Bales created the record upon which the termination decision was made, this Court finds that he was "meaningfully involved" in the decision to terminate, and any remarks made by him which demonstrate racial animus are considered relevant probative evidence.

Broersma's involvement was similar to that of Bales. The allegations and evidence, viewed in a light most favorable to the Plaintiffs, indicate that Broersma and Bales initiated a racially motivated campaign to create a record which would lead to the Plaintiffs' discharge, and were, therefore, "meaningfully involved" in the termination decisions.

Based on the foregoing, the Court finds that Plaintiffs have adduced sufficient evidence to establish a *prima facie* case under Title VII against Defendant UDF.

### C. The Plaintiffs' Prima Facie Case Under § 1981

A *prima facie* case of discrimination brought under § 1981 is established by, essentially, the same facts that would establish a *prima facie* case under Title VII. *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 378 (6th Cir.1984); *Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531, 539 (9th Cir.1982). A plaintiff can establish a *prima facie* case of discrimination under § 1981 through either direct or circumstantial evidence. *Id.*

■ One important difference between Title VII and § 1981 is that a plaintiff must demonstrate purposeful discrimination to support a § 1981 claim. *See General Building Contractor's Association, Inc. v. Pennsylvania,* 458 U.S. 375, 390, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The burden of demonstrating purposeful discrimination is present throughout the *prima facie* case and, if applicable, the pretextual analysis also. Thus, the relevant inquiry with respect to the § 1981 claims is whether there is any evidence in the record which indicates purposeful racial discriminatory conduct which acted to interfere with the Plaintiffs' contractual rights.

■ As a threshold consideration, the doctrine of *respondeat superior* —an employer is vicariously liable for the wrongful acts of its employees—does not apply to § 1981 actions. *See Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Kolb v. State of Ohio, Dept. of Mental Retardation and Developmental Disabilities, Cleveland Developmental Center, et al.,* 721 F.Supp. 885, 892 (N.D.Ohio 1989). The Court finds no evidence in the record which demonstrates that corporate defendant UDF engaged in pur-

---

4. Furthermore, the passage from *McDonald* cited by Defendants in this matter dealt with the analysis of age discrimination *under Michigan law.* The reason the plaintiff's claim in *McDonald* was rejected was not because of a failure to establish the *prima facie* case, but because the plaintiff failed to adduce any evidence of pretext. In fact, the *McDonald* court found that the comments of the intermediate supervisor were *direct* evidence sufficient to establish the *prima facie* case under federal law. *McDonald,* 898 F.2d at 1162.

posefully discriminatory conduct against the Plaintiffs or African–American employees as a group. On that basis, the Court hereby **GRANTS** Defendants Motions for Summary Judgment as to the § 1981 claims against Defendant UDF.

Defendants can be held individually liable for discrimination under § 1981, which prohibits interference with contractual rights on the basis of race. *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986); *Taylor v. Jones,* 653 F.2d 1193, 1200 (8th Cir.1981); *Faraca v. Clements,* 506 F.2d 956, 957 (5th Cir.1975), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). On the record before the Court, and for the same reasons set forth above in the Title VII analysis, the Plaintiffs have established a *prima facie* case for purposeful discrimination under § 1981 against Bales and Broersma. There is evidence that Bales and Broersma harbored racial animus against African–Americans and initiated a racially motivated campaign against the Plaintiffs with the intent of bringing about their ultimate discharge from the company.

The Court finds that Defendants' reliance on *Moorer v. Grumman Aerospace Corp.,* 964 F.Supp. 665 (E.D.N.Y.1997), for the proposition that at-will employees do not have the requisite contractual relationship to sustain a § 1981 claim, is not persuasive for two reasons. First, the court in *Moorer* relies upon a series of cases which were decided under *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The Supreme Court in *Patterson* held that actions involving discharges were not within purview of § 1981. That holding has since been abrogated by Congress' enactment of the 1991 Civil Rights Act, which amended § 1981 to apply to "the making, performance, modification, and termination of contracts ..." *See* 42 U.S.C. § 1981(a), (b).

Second, and equally important, the applicable law for determining whether a contractual relationship existed between the parties in this matter is that of Ohio, not New York. Under Ohio law, to prove the existence of an enforceable contract, an employee must establish the contractual foundations of offer, acceptance, and consideration. *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 103, 483 N.E.2d 150 (1985). It is undisputed that Plaintiffs were offered employment, accepted that offer, and gave adequate consideration via their labor. Thus, Plaintiffs had an enforceable contract with Defendant United Dairy Farmers, one which could be terminated at any time *for any reason not contrary to law. Henkel v. Educational Research Council,* 45 Ohio St.2d 249, 344 N.E.2d 118 (1976) (emphasis added). Because there was an enforceable contract between the parties, Plaintiff's claim of unlawful discharge falls squarely within the ambit of § 1981.

The Court finds, however, that the evidence with respect to the § 1981 claims against Caudill and Gray is insufficient to establish a *prima facie* case. While it is undisputed that Caudill performed security interviews with both Plaintiffs, and Gray notified both Plaintiffs of their discharge, there is no evidence which would demonstrate "purposeful discrimination" by either defendant, such as evidence or allegations that Caudill or Gray knew about the alleged campaign initiated by Bales and Broersma against the Plaintiffs.

Based on the foregoing, the Court finds that the Plaintiffs have established a *prima facie* case under § 1981 against Defendants Bales and Broersma.

### D. Defendants Affirmative Defenses Under Title VII and § 1981

Cases such as the present one, involving allegations and evidence of both legitimate and illegitimate considerations playing a role in an employment decision, are commonly referred to as "mixed motive" cases. In mixed motive cases where the plaintiff establishes the *prima facie* case through direct evidence of discriminatory animus, the *McDonnell Douglas* burden-shifting formula is inapplicable. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Terbovitz v. Fiscal Court of Adair County, Ky.,* 825 F.2d 111, 114–15. (6th Cir.1987), *abrog'd on other grounds, Price Waterhouse v. Hopkins,* 490

U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[5] As the Sixth Circuit has recognized, "[d]irect evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." *Terbovitz*, 825 F.2d at 115 (citing *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir.1985)).

In mixed motive cases where a defendant asserts an alternative justification for its employment decision or conduct, that justification becomes an affirmative defense. *Id.* Thus, in order to prevail on summary judgment, Defendants UDF, Bales and Broersma have the burden of establishing that there is no evidence in the record which would demonstrate the existence of genuine issues of material fact with respect to whether race played a role in the decision to discharge the Plaintiffs.

The Court finds that the Defendants have failed to meet such a burden. As set forth under the *prima facie* analyses for the Title VII and § 1981 claims, Plaintiffs have adduced evidence that they were the targets of a racially motivated campaign (designed to bring about their discharge), initiated by two intermediate level supervisors of Defendant UDF. The Court finds that such evidence is not only sufficient to establish the *prima facie* cases under Title VII and § 1981, but also to demonstrate that genuine issues of material fact exist with respect to the Plaintiffs' claims.

Based on the foregoing, the Court hereby **DENIES** Defendants' Motions for Summary Judgment with respect to the Title VII claims against Defendant UDF, and the § 1981 claims against Defendants Bales and Broersma.

### E. State Law Claims

#### 1. Breach of Contract

The Court notes that the Plaintiffs' at-will employment relationship was with Defendant UDF only. Thus, the Court hereby **GRANTS** Defendants' Motions for Summary Judgment with respect to the breach of con-

tract claims against Defendants Bales, Broersma, Caudill, and Gray.

As the Court noted under its § 1981 analysis, at-will contracts may be terminated at any time by either party *for any reason not contrary to law. Henkel, supra.* Based on the Court's analysis of the discrimination claims, there are genuine issues of fact with respect to whether the Plaintiffs were discharged for reasons which are not contrary to law. The Court therefore **DENIES** Defendants Motions for Summary Judgment with respect to the breach of contract claim against Defendant UDF.

#### 2. Claims Under Ohio Rev.Code § 4112

Ohio Rev.Code § 4112 is the state law equivalent of Title VII. While the state courts have not addressed the issue of whether defendants can be held individually liable under § 4112, the majority of federal courts addressing the issue have found that § 4112 does not provide for individual liability. *Osman v. Isotec, Inc.*, 960 F.Supp. 118 (S.D.Ohio 1997) (Dlott, J.); *Blankenship v. BMI Refractories*, 966 F.Supp. 555, (S.D.Ohio 1997) (Beckwith, J.); *Gausmann v. City of Ashland*, 926 F.Supp. 635 (N.D.Ohio 1996) (O'Malley, J.); *Czupih v. Card Pak Inc.*, 916 F.Supp. 687 (N.D.Ohio 1996) (Nugent, J.); *Redman v. Lima City Sch. Dist. Bd. of Educ.*, 889 F.Supp. 288, 292 (N.D.Ohio 1995) (Carr, J.); *Bremiller v. Cleveland Psychiatric Inst.*, 879 F.Supp. 782, 788 (N.D.Ohio 1995) (Oliver, J.). This Court follows the majority, and hereby **GRANTS** Defendants Motions for Summary Judgment with respect to the § 4112 claims against Defendants Bales, Broersma, Caudill and Gray.

For the reasons set forth under the Title VII analysis, the Court finds that Plaintiffs have met their burden and demonstrated that genuine issues of material fact exist with respect to whether discriminatory animus by UDF or its agents played a role in their discharges. The Court hereby **DENIES** De-

---

**5.** The portion of *Price Waterhouse* which abrogated part of *Terbovitz* was subsequently abrogated

by the 1991 Civil Rights Act. *See supra* n. 2.

fendants Motions for Summary Judgment as to the § 4112 claims against Defendant UDF.

## IV. CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Defendants' Motions for Summary Judgment with respect to the Title VII and state law claims against Defendants Bales, Broersma, Caudill and Gray, and the § 1981 claims against Defendants UDF, Caudill and Gray. The Court **DENIES** Defendants Motions for Summary Judgment with respect to the Title VII and state law claims against Defendant UDF, and the § 1981 claims against Defendants Bales and Broersma.

**IT IS SO ORDERED.**