RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0056P (6th Cir.)
File Name: 03a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

STANLEY JOHNSON,
          *Plaintiff-Appellant,*

          *v.*

THE KROGER COMPANY,
          *Defendant-Appellee.*

No. 01-3432

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-01173—George C. Smith, District Judge.

Argued: August 7, 2002

Decided and Filed: February 19, 2003

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Emily J. Lewis, LAW OFFICES OF EMILY
LEWIS, Dublin, Ohio, for Appellant. Bradd N. Siegel,
PORTER, WRIGHT, MORRIS & ARTHUR, Columbus,

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

Ohio, for Appellee. **ON BRIEF:** Emily J. Lewis, LAW OFFICES OF EMILY LEWIS, Dublin, Ohio, for Appellant. Bradd N. Siegel, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which MOORE, J., joined. ROSEN, D. J. (pp. 18-34), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge. Stanley Johnson, an African-American male, brought suit against his former employer, The Kroger Company, alleging that Kroger discharged him on the basis of his race. The district court granted Kroger's motion for summary judgment, concluding that Johnson had failed to establish that the legitimate, nondiscriminatory reason given by Kroger for terminating Johnson's employment was a pretext designed to mask racial discrimination. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

Johnson began working for Kroger in 1986, when he entered the company's management-training program. After completing the program and working at two other Kroger stores in Ohio, Johnson was assigned to work as one of two comanagers at Kroger's Portsmouth, Ohio store in 1989. He worked at the Portsmouth store through January of 1995.

At the time of Johnson's transfer to the Portsmouth store, the manager was Don Allison and the senior comanager was Denis Kirkbridge. Allison's first evaluation of Johnson in 1990 rated him between "marginal" and "satisfactory." The

a scintilla of evidence as to the first of these propositions, and none whatsoever as to the second. Thus, I would affirm the District Court's award of summary judgment to Kroger, and I respectfully dissent from the majority's reversal of this ruling.

following year, Johnson received a "satisfactory" rating, a recognition that his performance was improving. Allison also recommended that Johnson be given a pay raise in 1991.

Randy Roberts replaced Allison as the manager of the Portsmouth store in December of 1991. In addition, Paul Gaines replaced Kirkbridge as the senior comanager sometime in late 1991 or early 1992. Because Roberts had not supervised Johnson for most of 1991, Joe Martin, the manager of Kroger's Zone 6, completed Johnson's performance evaluation in February of 1992. (Kroger divides its stores into geographical "zones.") Martin gave Johnson a "marginal" rating. According to Johnson, this rating reflected the fact that he was falsely accused of making "1-900" pay telephone calls to live-sex phone numbers from the manager's office at the Portsmouth store. Johnson, who was the only African-American employee at the store, avers that Martin made this accusation at the beginning of Johnson's performance-evaluation meeting.

Roberts gave Johnson a "satisfactory" rating for both 1992 and 1993, noting that Johnson's performance was progressing. Senior Comanager Gaines, on the other hand, testified in his deposition that Johnson was an excellent comanager who had superior skills in customer and employee relations and was qualified to become a store manager. No performance evaluation was prepared for Johnson in 1994 because of personnel changes in Zone 6. But Roberts testified in his deposition that Johnson's work was satisfactory and improving in 1994.

In January of 1995, Johnson was transferred to Kroger's Wheelersburg, Ohio store. Wheelersburg is only 12 miles from Portsmouth, but the number of African-Americans living in the two localities differs markedly. In particular, Wheelersburg had only 8 African-American residents in 1990, whereas 1,172 African-Americans lived in Portsmouth. Johnson expressed misgivings about moving to the Wheelersburg store because he had heard that the town had a

reputation for racial intolerance, but he ultimately agreed to the transfer.

Both Portsmouth and Wheelersburg are within Zone 6, but the Wheelersburg location has only one comanager. Johnson was therefore the sole assistant to the store's manager. He worked under the supervision of Dan Newman, the manager of the Wheelersburg store. Before Johnson began working at the Wheelersburg location, Newman spoke with Roberts about Johnson's abilities. According to Newman, Roberts told him that Johnson lacked initiative, was useless as a comanager, and was the worst comanager Roberts had ever supervised.

Johnson believes that both Newman and Roberts harbored racially discriminatory views. With respect to Roberts, Johnson avers that he once overheard Roberts calling African-American men "black boys." Similarly, when Newman learned that Johnson was going to be transferred to the Wheelersburg store, Newman told Portsmouth Senior Comanager Gaines that assigning an African-American male as the comanager of the Wheelersburg store would hurt its business because African-Americans did not shop there.

The deposition testimony of several employees who worked at the Wheelersburg store suggests that the store was not a model of racial tolerance. For example, the store's head produce clerk testified that, shortly before Johnson's arrival, Newman told the employees to be careful about the jokes that they told. Several of the store's department heads also recalled hearing employees make racial slurs. Newman also held a meeting with the store's department heads just before Johnson's arrival. Several of those attending the meeting testified in their depositions that Newman told them that Johnson was not very intelligent and that they would need to assist him. (Newman denies making any such disparaging remarks, but because we are reviewing the grant of Kroger's motion for summary judgment, all contested facts must be resolved in Johnson's favor.)

performance, which merely corroborated Noyes' own assessment of Johnson's shortcomings.

This leaves only the possibility that Noyes herself evidenced discriminatory animus in making her discharge decision. Initially, I note that such a contention would be difficult to square with Noyes' offer to transfer Johnson to a different position which, in her view, was better suited to his strengths; Johnson was discharged only after he refused this offer. Moreover, the majority implicitly acknowledges the lack of evidence that Noyes acted with discriminatory motives. At most, explains the majority, "the record is silent" concerning Noyes' treatment of Johnson as compared to other employees, whether or not similarly situated. (Majority Op. at 15.) Nonetheless, the majority engages in speculation on this point, observing that an inference of discrimination might arise if, for example, "Noyes blamed Johnson for the problems at the [Wheelersburg] store without reprimanding other potentially blameworthy employees." (*Id.*)

I readily agree that this sort of differential treatment, if shown through evidence and left unexplained, would tend to strengthen Johnson's claim of discriminatory discharge. Indeed, there are all sorts of hypothetical events which, had they occurred, might have assisted Johnson in showing that Kroger acted with discriminatory motives. Yet, a silent record and mere conjecture cannot satisfy Johnson's burden to show that Kroger's stated, nondiscriminatory reason for discharging him is a mere pretext for race discrimination. Rather, affirmative evidence is required, and Johnson has produced none that would permit the inference that Noyes' decision rested in any part upon considerations of Johnson's race.

### III.

As the majority recognizes, the claim of discrimination in this case rises or falls upon the premises that Stanley Johnson's direct supervisor, Dan Newman, was racially biased, and that Newman brought this alleged animus to bear upon Kroger's discharge decision. In my view, there is only

to "go and motivate themselves to get this information," and that "it's not good just to blame one store manager in nine years for not teaching you anything." (*Id.* at 120, J.A. at 669.)

Moreover, on those infrequent occasions when Noyes invited Newman to express his opinion about Johnson and his job performance, the record reveals that Newman often used these opportunities to serve as an ***advocate*** for Johnson, and not a detractor. Most significantly, when Noyes informed Newman that she was considering terminating Johnson, Newman responded by asking whether "there was anything more he could do to help" Johnson. (*Id.* at 165-66, J.A. at 675-76.)  More generally, while Newman occasionally expressed a desire to do more to address the problems that Noyes had identified at the Wheelersburg store, and voiced his frustration that these deficiencies would reflect poorly upon him as store manager, Noyes responded by expressly directing Newman to "hold back" in order to "give [Johnson] the opportunity to show what he could do." (*Id.* at 91-93, J.A. at 656-58.)

Noyes' testimony, in short, belies any suggestion that she acted as a mere conduit of Newman's alleged racial prejudice, or his "cat's paw," in reaching the decision to discharge Johnson.  In this regard, this case is far different from *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877-78 (6th Cir. 2001), in which we found support for a "cat's paw" theory in senior management's failure to conduct an independent investigation, and its reliance instead upon the account of an allegedly biased lower-level employee.  Here, by contrast, Noyes testified that she based her decision upon an independent assessment of Johnson's job performance, informed principally by her own direct, repeated, and unchallenged observations.  Absent any basis to disregard Noyes' testimony on this point — and, of course, Johnson cannot withstand summary judgment on the mere hope that a jury might not believe her, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986) — the record is clear that Newman provided no input into Noyes' decision beyond his ability to observe Johnson's day-to-day

Johnson and Newman had a dysfunctional relationship from the start.  According to Johnson, Newman did not introduce him to the department heads, criticized him in public, and blamed Johnson when the store ran out of products, even though another employee, a department head who was Newman's cousin, was primarily responsible for ordering merchandise.  Several employees testified that Newman had never treated Caucasian comanagers in a similar manner. These employees also said that Newman did not mentor and train Johnson in the same way that he had assisted Caucasian comanagers, but instead ignored him.

Nancy Noyes became Kroger's Zone 6 manager in the fall of 1995.  She replaced Ed McCauley, who testified in his deposition that the Wheelersburg store's sales had improved in the months since Johnson became the comanager, and that Johnson was trying hard to do a good job.  Noyes visited the Wheelersburg store in November of 1995.  During that inspection, she noted that (1) the quality of the bananas was poor and the meat cases contained dark meat, but the prices had not been reduced for either of these items, (2) Johnson was unfamiliar with Kroger's markdown policy, (3) Johnson had ordered an excessive quantity of potato chips, apparently due to a misunderstanding of Kroger's cost-billing accounting method, and (4) the dairy department was unkempt. Johnson acknowledged that these problems existed, but contends that other employees were responsible for the deficiencies and that Noyes had higher standards than those to which he was accustomed.

According to Noyes, Newman wanted to intervene because of his concern that the poor conditions would reflect badly upon him. But Noyes encouraged Newman to refrain from taking any action so that Johnson would have the opportunity to develop his own solutions.  Noyes's next visit to the store in December of 1995 resulted in her finding many of the same problems.   Johnson avers that Noyes treated him unprofessionally and disrespectfully, using a hateful tone of voice that she did not use when speaking to Caucasian employees.

Newman, working in conjunction with Noyes, prepared a performance evaluation for Johnson in January of 1996. Johnson was rated as "marginal." The evaluation identifies some of the same problems that Roberts and Allison had noted when they had evaluated Johnson's performance at the Portsmouth store: a failure to motivate or ensure results from department heads, lack of initiative and follow-through, and an insufficient knowledge of store operations.

Noyes discussed Johnson's evaluation with him in February of 1996. Following her conversation, she concluded that the comanager position was not a good match for Johnson and encouraged him to consider other jobs with Kroger. Noyes told Johnson that although he was good with customers, he did not have "an analytical mind." Several employees who worked with Johnson disagreed with Noyes's opinion that Johnson was not suited to be a comanager. Both Gaines and Kirkbridge, for example, thought that Johnson was extremely capable. These comanagers testified in their depositions that they had both trained Johnson on paperwork duties and that Johnson learned as quickly as the other comanagers with whom they had worked. Gaines also emphasized Johnson's superior customer-relations skills. Numerous department heads at the Wheelersburg store similarly believed that Johnson was performing in an effective manner. They testified in their depositions that Johnson was executing his duties as well as or better than the store's previous comanagers.

Despite these accolades, several problems at the Wheelersburg store were once again documented in June of 1996. The Zone 6 meat merchandiser discovered another meat-dating problem, and a different member of Noyes's staff observed deficiencies such as low product levels and unkempt conditions when he visited the store. Moreover, Johnson was unable to provide Noyes with the store's sales and budget figures when she went to the store in June, even though she had previously told Johnson that he needed to know that information.

nine years, [Johnson] ought to pretty much be able to run that entire store in [Newman's] absence." (Noyes Dep. at 91, J.A. at 656.) Yet, her walkthroughs of the Wheelersburg store in Newman's absence revealed that Johnson was not meeting this standard. Noyes stated, for example, that she never witnessed any "major" or "long-term improvements" during these visits, and that Johnson never succeeded in "get[ting] the whole job done" that she expected from him. (*Id.* at 169-70, J.A. at 679-80.) As noted earlier, the contemporaneous reports of Noyes and her staff confirm her testimony on this subject, as they disclose a variety of problems while Johnson was in charge of the store.

Throughout this several-month period in which Noyes and her staff observed Johnson's deficient job performance and determined what to do about it, Newman was consulted almost exclusively in a fact-gathering role, "reporting back to [Noyes] how [Johnson] was reacting and performing." (*Id.* at 165, J.A. at 675.) There is no evidence that Newman identified any deficiency in Johnson's performance that had not been directly observed by Noyes and her staff. Nor, more generally, does the record disclose any instance of Newman "poisoning the well" of information upon which Noyes based her appraisals of Johnson's performance.

Even on the one occasion where Newman played a larger role in assessing Johnson's job performance — specifically, his preparation of Johnson's January 1996 evaluation — the record demonstrates that Noyes was substantially involved in this process, and did not simply take Newman's word on the subject. Noyes testified that she expressly consented to Johnson's "marginal" rating, and discussed the matter with Newman to ensure that they "agreed on how we were perceiving [Johnson's] performance." (*Id.* at 103, J.A. at 665.) Noyes also met directly with Johnson to discuss this unfavorable review, and expressly addressed (and refuted) Johnson's attempt to shift the blame to Newman. When Johnson complained that the shortfalls in his performance were the result of Newman not training him properly, Noyes responded that it was "part of a co-manager's responsibility"

managers"). Rather, it is clear that Newman's authority does not extend beyond the employees at the Wheelersburg location. Finally, I have already noted the absence of a direct nexus, whether temporal or otherwise, between Newman's allegedly discriminatory conduct and statements — most or all of which were roughly contemporaneous with Johnson's transfer to Wheelersburg in January of 1995 — and Noyes' discharge decision nearly two years later. *See, e.g.*, *Hopkins v. Electronic Data Systems Corp.*, 196 F.3d 655, 662-63 (6th Cir. 1999) (holding that an isolated remark made by the plaintiff's supervisor lacked a sufficient nexus to the plaintiff's termination several months later).

Despite all this, the majority holds that the record leaves open the possibility that Newman's alleged racial bias might have influenced Noyes in her decisionmaking process. According to the majority, Newman's possible influence upon Noyes can be inferred from a combination of four factors: (i) Newman's day-to-day supervision of Johnson; (ii) the joint participation of Newman and Noyes in rating Johnson's job performance as "marginal" in a January 1996 evaluation; (iii) Noyes' discussions with Newman regarding the problems she observed during her visits to the Wheelersburg store in late 1995; and (iv) Noyes' consultation with Newman before reaching her ultimate decision to offer Johnson a transfer to a service director position. And, indeed, if these factors were viewed at a sufficient level of abstraction, I might agree that they could serve as indicia of Newman's role in the decisionmaking process. Any such conclusion, however, would run afoul of Noyes' more specific and wholly unrefuted testimony on each of these points.

All of the various considerations identified by the majority derive their legal significance from the *opportunity* they might provide Newman to influence Noyes' decision. Yet, the record establishes that these opportunities were limited at best, and did not, in fact, alter Noyes' decisionmaking process or its final outcome. In particular, Noyes testified that she had her own criteria for assessing Johnson's performance as a comanager; in her view, "[h]aving been a co-manager for

Following these incidents, Noyes consulted with several employees who had observed Johnson's performance, and with Mike Purdum, who worked in Kroger's Human Resources Department. Newman, like the other employees to whom Noyes spoke, confirmed Noyes's perception that Johnson was not performing adequately.

Noyes decided at that point to offer Johnson a service director position that would be based elsewhere in Ohio. Both Noyes and Purdum believed that the job would be better suited to Johnson's customer-service skills. But Johnson declined the offer in August of 1996. Johnson was finally discharged from his employment with Kroger effective November 2, 1996, although he stopped working in August of that year.

According to Johnson, Kroger's decision to offer him a nonmanagement position constituted a departure from its normal procedures. Ed McCauley, who was the Zone 6 manager when Johnson was transferred to the Wheelersburg store, testified by deposition that his practice was to transfer managerial-level employees to other stores if they were not succeeding in a particular location. But McCauley recognized that every zone manager handles personnel problems differently. Johnson nevertheless emphasized that, unlike four Caucasian managers whom McCauley transferred to other stores, Johnson's request for a transfer was denied by Noyes. McCauley also identified four managers whom he had placed on probation or under corrective action plans before they were discharged. Johnson was never placed on such a plan.

## B.    Procedural background

This lawsuit was filed in the United States District Court for the Southern District of Ohio in November of 1998. Johnson's complaint alleges that Kroger discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, by (1) denying him training, (2) failing to promote him, (3) retaliating against him, (4) allowing a hostile work environment to exist, and

(5) discharging him. In addition, the complaint includes several state-law claims.

Kroger filed a motion for summary judgment in March of 2000. Approximately one year later, the district court granted Kroger's motion as to all of Johnson's federal claims and dismissed the state-law claims without prejudice. This timely appeal challenges only the district court's disposition regarding the federal claim of a racially discriminatory discharge.

## II. ANALYSIS

### A.   Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.   Racial discrimination claim

In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (setting forth the requirements for racial discrimination claims). Johnson contends that the record includes both direct and circumstantial evidence of discrimination. We will therefore examine both possibilities below.

are not attributable to Raglin." More recently, we emphasized that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (internal quotations and citation omitted).

In *Wells v. New Cherokee Corp.*, 58 F.3d 233, 237-38 (6th Cir. 1995), by contrast, we found relevance in a direct supervisor's age-related remark, where the testimony at trial indicated that this supervisor and the ultimate decisionmaker "worked closely together and consulted with each other on personnel decisions," these individuals themselves testified about their collective decision to fire the plaintiff, and the direct supervisor actually "prepared and signed the termination report." More generally, we have identified a number of factors to be considered in assessing the probative value of a direct supervisor's statements or conduct, including this individual's role in the challenged personnel decision, his or her position in the overall corporate hierarchy, and the existence or absence of a direct temporal or other nexus between the allegedly discriminatory conduct and the adverse employment action. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-57 (6th Cir. 1998).

None of these factors assist Johnson in his effort to inject Newman's alleged racial animus into Nancy Noyes' discharge decision. The record establishes, and the majority acknowledges, that Noyes alone made the decision to terminate Johnson, with others called upon to provide only limited input into this decisionmaking process. *Compare Wells*, 58 F.3d at 237-38 (citing evidence of a joint decision between the plaintiff's direct supervisor and a higher level manager). Moreover, it cannot be said that Newman occupied a senior position in Kroger's corporate hierarchy, such that his statements or conduct could be deemed indicative of a companywide policy or practice of race discrimination. *Compare Ercegovich*, 154 F.3d at 357 (noting that the alleged statements in that case were made by "the most senior

Accordingly, if Johnson's claim of discrimination rests upon the premise that Newman's conduct toward him was racially motivated — and the majority acknowledges that it does — I view the record as inadequate to support this proposition. The most that can be said is that Newman and Johnson did not get along very well. There is not a shred of evidence, however, that considerations of race had anything to do with this. To the contrary, the record indicates that Newman clashed with a number of employees, without regard to their race. Even so, ***not one*** Kroger employee was prepared to say that Newman's conduct toward Johnson (or anyone else) was racially motivated. (*See*, *e.g.*, Apel Dep. at 32-33, J.A. at 225-26; Billiter Dep. at 16, 25, J.A. at 229, 232; Cooper Dep. at 9, 25-26, J.A. at 244, 248-49; Groves Dep. at 19-20, J.A. at 300-01; Gunnoe Dep. at 13-14, 24-25, J.A. at 306-07, 310-11; Jarrells Dep. at 18, 23, 33-34, J.A. at 315, 320-22; Tackett Dep. at 10, 25, J.A. at 723, 738.)

But, in any event, all of this is mere preamble to my principal disagreement with the majority. Even assuming that Newman might have exhibited racial animus toward Johnson at some point, the record utterly fails to support the further and legally essential proposition that this alleged bias seeped into upper management's decision to discharge Johnson. To the contrary, rather than encouraging or endorsing Johnson's discharge, Newman actually opposed this action, asking the principal decisionmaker, zone manager Nancy Noyes, whether there was anything more that he could do to assist Johnson in remaining as comanager of the Wheelersburg store.

Our precedents eschew any bright-line rule as to whether a direct supervisor's discriminatory remarks or conduct should or should not be deemed relevant to a discharge decision made by someone higher up the corporate ladder. In *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990), for example, we disregarded certain age-based comments allegedly made by the plaintiff's direct supervisor, Chris Bakaitis, because the plaintiff "was fired by Bakaitis' supervisor, Carl Raglin, and Bakaitis' discriminatory remarks

### 1.  Direct evidence of discrimination

Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). This court has explained that "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. *Nguyen*, 229 F.3d at 563 (noting that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent").

Johnson argues that the following statements constitute direct evidence of discrimination: (1) Newman's comment expressing concern about the potentially detrimental effect on business of having an African-American comanager, (2) Newman's remarks to the store's department heads regarding Johnson's lack of ability and intellectual shortcomings, (3) Noyes's notation and comments in connection with Johnson's performance evaluation that he lacked initiative, and (4) Noyes's suggestion that Johnson should consider other positions with Kroger because he lacked "an analytical mind."

Contrary to Johnson's position, none of these instances compel the conclusion that Noyes's decision to discharge Johnson was motivated by racial animus. The concern that Johnson's presence would adversely effect the Wheelersburg

store's business, for example, does not compel the conclusion that Newman sought to have Johnson removed from the position of comanager. Deriving this purported desire from Newman's comment requires the inferential step of concluding that because Newman held this belief, he would want to have Johnson's employment terminated. Similarly, the comments about Johnson's initiative and intelligence would support a finding of racial discrimination only if a factfinder were to infer that Newman and Noyes believed that Johnson lacked these traits because of his race. The need to draw such inferences prevents these remarks from constituting direct evidence of discrimination. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (holding that a statement of fact relating to the plaintiff's age was not direct evidence of age discrimination, because the relevance of the comment "is provided by inference"). We therefore conclude that Johnson has failed to provide any direct evidence of discrimination.

### 2. *Whether Kroger's explanation was a pretext to hide racial discrimination*

Because Johnson has failed to present any direct evidence of discrimination, the burden-shifting approach first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies to the present case. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Under the *McDonnell Douglas* framework, the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination. *Id.* The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Id.* at 573 (internal quotation marks omitted). If the defendant is able to satisfy this burden, the plaintiff must then "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

inference that this somehow reflected Newman's own racially intolerant views. In order to tolerate or foster racist behavior, it seems to me, one must be aware of it and yet take no action. The record before us supports neither of these propositions. Of the four employees who testified that they had heard racial jokes at the Wheelersburg store, none said that Newman was aware of such jokes or present when they were made. (*See* Bobst Dep. at 8, J.A. at 237; Cooper Dep. at 18-19, J.A. at 245-46; Gunnoe Dep. at 14, J.A. at 307; Jarrells Dep. at 18, J.A. at 315.)[4] Nonetheless, there *is* evidence that, prior to Johnson's arrival in Wheelersburg, Newman took preventative action against the use of any such inappropriate language in the future. If any inference could arise from this evidence, one way or the other, it seems to me that such precautionary measures should be welcomed, as a means of promoting civil behavior and ensuring that employees are aware of their responsibility to maintain an open and tolerant workplace environment.[5] And, again, I note that any such cautionary remarks by Newman seemingly would have comported with Johnson's own concern that the Wheelersburg community had a reputation for racial intolerance.

---

[4] Only one of these employees was able to identify a particular individual who had made racial slurs. (*See* Cooper Dep. at 18-19, J.A. at 245-46.) Cooper identified this individual as Tom Gunnoe, one of the other three Wheelersburg employees who accused unnamed coworkers of telling racial jokes, but was unable to say which of his fellow employees had done so. According to Gunnoe, "[i]t could be anybody from baggers to truck drivers," and it "was just something that happens." (Gunnoe Dep. at 14, J.A. at 307.)

[5] Indeed, if Newman had instead done nothing, the majority presumably would have concluded (and I likely would have agreed) that his acquiescence in racially intolerant conduct could be indicative of his own discriminatory views. This seems to suggest, then, that bare evidence of racial jokes in a workplace can support an inference of a supervisor's racial animus, regardless of his level of awareness of this conduct or the stance he takes toward it.

Despite this record, the majority states that "Johnson and Newman had a dysfunctional relationship from the start," that "Johnson and other employees" testified that Newman had "criticized [Johnson] in public," and that "[s]everal employees testified that Newman had never treated Caucasian comanagers in a similar manner." (Majority Op. at 4-5, 14.) The evidence, in my view, does not support this account. Most significantly, the *lone example* of differential treatment identified by Wheelersburg employees was that Newman seemed less communicative and had less interaction with Johnson than with other comanagers under his supervision. (*See* Apel Dep. at 30, J.A. at 224; Cooper Dep. at 20, J.A. at 247; Tackett Dep. at 17, J.A. at 730.)[3] Any weak inference of race-based animus that could possibly arise from this evidence is undercut by Johnson's own testimony that, upon working with Newman and perceiving the "demeaning content and tone" in their conversations, he decided to "talk to [Newman] on the fringes, otherwise keep to myself." (Johnson Dep. at 334, J.A. at 436.)

Similarly, even accepting the majority's characterization of the Wheelersburg store as "not a model of racial tolerance," (Majority Op. at 4), I find no evidentiary support for the

---

store, it was the comanager's fault or the department head's fault," (*id.* at 11, 12, 18, 21, 63, J.A. at 260, 261, 266, 269, 284.)

[3]Although Johnson claims (and the majority accepts) that Newman offered more training to other comanagers than to Johnson, the sole employee cited as stating this proposition actually testified merely that Newman seemed to "spend more time" with other comanagers than with Johnson, but that she would not have been in a position to know how much training was being done during this time, nor whether Newman had provided operational training to Johnson back in the office and out of her sight. (*See* Apel Dep. at 30, 41, J.A. at 224, 228.) In contrast, an individual in a better position to comment on this subject, Paul Gaines (the comanager who preceded Johnson in Wheelersburg), stated that Newman "never had a very good record of trying to train comanagers." (Gaines Dep. at 12, J.A. at 261.)

Kroger concedes that Johnson established a prima facie case of discriminatory discharge. Likewise, Johnson concedes that Kroger articulated a legitimate, nondiscriminatory reason for terminating his employment; namely, the inability to satisfactorily perform his duties as a comanager. The disposition of this case thus hinges upon Johnson's contention that the justification proffered by Kroger was a pretext designed to mask racial discrimination.

A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Regardless of which option is used, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (alteration in original) (internal quotation marks and citation omitted).

Johnson does not dispute that Noyes and other Kroger employees working under her supervision documented instances of unsatisfactory conditions in the Wheelersburg store, even after he had been told about the problems. Thus, the first potential method of challenging an employer's explanation—contesting its factual basis—is not available to Johnson.

In contrast, both the second and the third methods of establishing that Kroger's explanation was a pretext intended to hide illegal discrimination are relevant in the present case. A plaintiff using the second option "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal," but "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove

that an illegal motivation was *more* likely than that offered by the defendant." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original). The third possibility generally "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.*

Johnson presented the testimony of many of his coworkers in support of his contention that Kroger treated him differently than Caucasian comanagers. Several of the department heads at the Wheelersburg store, for example, said that Johnson fulfilled his responsibilities as well as Caucasian comanagers who had not been reprimanded, much less discharged. Gaines and Kirkbridge, both of whom had previously worked with Johnson as comanagers, were of the opinion that Johnson was quickly learning the paperwork responsibilities that Noyes identified as one of his shortcomings. Similarly, McCauley noted that the Wheelersburg store's sales improved in the months following Johnson's arrival. McCauley's deposition testimony also supports Johnson's contention that he was treated differently than Caucasian managers, because Johnson was not given the opportunity to transfer to a different store, nor was he placed on probation or under a corrective action plan prior to being discharged.

The above evidence regarding Kroger's treatment of Caucasian managers relates to the third method of disproving what would otherwise be a legitimate, nondiscriminatory explanation for discharging an employee. But Kroger contends that because none of the allegedly comparable employees with whom Johnson seeks to contrast his treatment were supervised by Noyes, their experiences while working for Kroger are not relevant. In addition, Kroger notes that McCauley recognized that each zone manager handles personnel problems differently. The most relevant consideration, according to Kroger, is that although Noyes supervised dozens of managers and comanagers, Johnson has

A: No, I can't.

Q: What company meeting was it?

A: Just one of the zone meetings or whatever.

Q: And what was it that Mr. Johnson said?

A: Like I said, I can't tell you that word for word.

Q: I'm not asking you for exact words right now. I'm asking you if you can remember the substance of what he said.

A: No, I can't. I can't remember.

Q: And you can't remember what Mr. Newman said?

A: No.

Q: We just have all you can say so far that's happened?

A: That's what you've got.

Q: Without any specifics?

A: That's what you've got.

(Gaines Dep. at 85-86, J.A. at 291-92.)

Whatever Gaines might have witnessed, it clearly did not occur in front of Johnson's subordinates or customers, as Gaines and Johnson did not work together at the Wheelersburg store. Nor was Gaines asked whether Newman's conduct on this occasion was unique to Johnson, or whether Newman might have acted similarly toward other comanagers. More generally, though Gaines speculated at one point that Newman perhaps might have "picked on" Johnson more than him, Gaines could not "say exactly" how this was so. (Gaines Dep. at 63, J.A. at 284.) The remainder of Gaines' deposition, in contrast, is replete with testimony that Newman treated his comanagers equally, albeit poorly. Gaines opined, for example, that Newman "never had a very good record of trying to train comanagers," was "notorious for giving bad evaluations," had a "pretty bad reputation," had "a record of . . . comanagers quitting" on him, was the "type of guy [who] didn't like anybody that customers liked better than himself," did not "like anybody interfering or even trying to help him run his store," and had the attitude that "[i]f anything happened at the

Nevertheless, the majority determines that the evidentiary weaknesses in these alleged remarks are overcome by the totality of evidence of Newman's supposedly poor treatment of Johnson and his purportedly discriminatory views. In reaching this conclusion, however, I fear that the majority has too readily adopted Johnson's unsubstantiated gloss upon the record. Johnson claimed in an affidavit, for example, that Newman "criticiz[ed] and belittl[ed] me on a frequent basis before customers and subordinates," and "humiliated me in front of employees." (Johnson Aff. at ¶ 17, J.A. at 110.) Yet, when questioned on this subject at his deposition, Johnson identified only a single instance of public criticism within the first week or two after his transfer to Wheelersburg, and this incident occurred in front of vendors rather than employees or customers. (*See* Johnson Dep. at 222, J.A. at 399.) Moreover, the two employees cited by Johnson as having witnessed Newman's purportedly "demeaning" treatment of him, (Appellant Br. at 14), actually testified that they **never** saw Newman speak to Johnson in a disrespectful tone or berate him in public. (*See* Cooper Dep. at 34, J.A. at 251; Tackett Dep. at 22, J.A. at 735; *see also* Gunnoe Dep. at 13, J.A. at 306 (stating that Newman "was a hard man to get along with sometimes," but that he had never witnessed Newman yell at Johnson).)[2]

---

[2]The only other evidence of allegedly belittling conduct is found in the deposition testimony of Paul Gaines, who preceded Johnson as comanager of the Wheelersburg store. Gaines' account of this alleged incident is not terribly illuminating, however:

A:  . . . . I have seen [Newman] belittle Stan [Johnson] on different things at like company meetings and stuff like that. Stan would say something and [Newman] had to add his two cents worth to kind of belittle what Stan just said.

Q:  Can you give me an example?

A:  No, I can't. I can't give you exact words from four or five years ago.

Q:  No, I'm not asking you to say exact words. I said an example.

not identified any Caucasian managers under her authority who exhibited shortcomings similar to his own but who received more favorable treatment. Moreover, several other African-American comanagers who were supervised by Noyes testified in their depositions that they had no reason to believe that Noyes discriminated against them or against anyone else because of their race.

This court has explained that "the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all of the *relevant* aspects" in order for the two to be similarly-situated. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (internal quotation marks omitted). In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct. *Id*. (noting that "[t]hese factors generally are all relevant considerations in cases alleging differential disciplinary action"). But the weight to be given to each factor can vary depending upon the particular case. *Id*. (explaining that courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee").

Johnson relies upon *Ercegovich* to support his argument that his treatment should be compared not only with the managerial-level employees supervised by Noyes, but also with managers supervised by McCauley, her predecessor as zone manager. But the employees supervised by Noyes undoubtedly provide the most appropriate group of people with which Johnson's treatment should be compared. Moreover, McCauley's acknowledgment that zone managers handle personnel matters differently further supports the propriety of concentrating on managers whom Noyes supervised when comparing Johnson's experiences with those of other Kroger managers. We therefore conclude that Johnson has failed to identify any similarly-situated

employees who were treated differently for exhibiting managerial problems comparable to his own.

A more promising avenue from Johnson's point of view goes back to the second method of challenging Kroger's explanation for discharging him—that the nondiscriminatory reason given "did not actually motivate the defendant's challenged conduct . . . ." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). The record contains several instances that Johnson contends support a finding that Kroger was more likely than not motivated by illegal racial animus. For example, he points to Newman's concern that having an African-American comanager would have an adverse effect on the Wheelersburg store's business. Johnson also notes that several employees at the Wheelersburg store testified that Newman told them to cease telling racial jokes, and that some employees at the location had made racial slurs in the past.

Moreover, the record supports a finding that Newman treated Johnson less favorably than he had treated Caucasian comanagers. Johnson and other employees testified by deposition that Newman refused to mentor or train Johnson, and instead ignored him. They also said that Newman did not introduce Johnson to department heads, criticized him in public, and blamed him for errors that occurred in areas that were the responsibility of other employees.

Kroger seeks to minimize this evidence by emphasizing that Noyes was the decisionmaker, so that any bias exhibited by Newman was irrelevant. Although remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statements of managerial-level employees who have the ability to influence a personnel decision are relevant. *Ercegovich*, 154 F.3d at 354-55 (concluding that the plaintiff presented a genuine issue of material fact as to whether the manager in question was involved in the employer's decision to eliminate the plaintiff's position without giving him the opportunity to transfer elsewhere). Newman not only supervised Johnson on a daily basis, but also spoke with

would not have made the very same comments about any comanager, regardless of his race, whose arrival at the Wheelersburg store was preceded by accounts of poor job performance.[1]

---

[1]Indeed, one of the two employees — and not several, as stated by the majority — who claimed to have heard Newman comment about Johnson's intelligence further testified:

Q: Okay. What did you think when [Newman] told you that the . . . comanager was not that smart?

A: What did I think?

Q: Yeah. Did you find that an odd comment to make?

A: No, not from Mr. Newman.

Q: No, not from Mr. Newman. Why not?

A: Because Mr. Newman never thought that anyone was smart except for himself. Mr. Newman was an egomaniac that should have been released from Kroger's employment years ago. He treated everyone like dirt . . . .

Q: Did you think that he discriminated against people?

A: He treated everyone equally.

Q: Okay. He treated everyone like dirt?

A: He treated everyone like dirt, yes.

Q: Okay.

A: Regardless of race. I don't think that race is the issue here. I think we're dealing with a person who had a severe ego problem, that thought only that no one possessed intelligence other than him.

(Cooper Dep. at 8-9, J.A. at 243-44.) Likewise, the other employee who reported this remark did not believe that it was racially motivated. (Tackett Dep. at 10-12, J.A. at 723-25.)

before Johnson's arrival in Wheelersburg that Johnson was not very intelligent and that the employees needed to work with him. Accepting, for the moment, that these remarks are indicative of racially discriminatory views, Newman necessarily must have made them ***before*** Johnson's transfer to Wheelersburg in January of 1995, or nearly two years before Johnson was terminated in November of 1996. This sizable temporal gap precludes any reliance upon these alleged statements as supporting an inference of discrimination in Johnson's eventual discharge. *See Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1025-26 (6th Cir.) (holding that discriminatory remarks made "nearly a year before" the challenged employment decision could not support an inference of discrimination), *cert. denied*, 510 U.S. 861 (1993).

These alleged remarks also are far too ambiguous to raise such an inference. *See Phelps*, 986 F.2d at 1025-26. Regarding the possible impact of Johnson's transfer upon business at the Wheelersburg location, it is noteworthy that Johnson himself expressed a similar concern at the time, stating a reluctance to relocate to Wheelersburg because of "the racial intolerance that was characteristic of that area." (Johnson Dep. at 201, J.A. at 386.)   Seemingly, then, Newman and Johnson were making the very same observation about the potential biases of Wheelersburg customers. As for Newman's purported remark to his department heads that Johnson was not very intelligent, Newman himself testified (i) that he had been told by Johnson's previous supervisor, Randy Roberts, that Johnson was "the worst comanager he'd ever had" and that "he was absolutely useless as a comanager," and (ii) that he relayed this information to his department heads, stating that Johnson "didn't have the reputation of being the best comanager but we would work with him and see what we could do." (Newman Dep. at 37-38, J.A. at 582-83.) While I agree with the majority that such statements are disparaging, whether framed in terms of Johnson's intelligence or otherwise, I see nothing in them (or elsewhere in the record) to suggest that Newman considered Johnson's race in making these remarks, or that Newman

Noyes about the problems she identified during her store visits in late 1995, assisted Noyes in preparing Johnson's performance review in January of 1996, and consulted with Noyes prior to her ultimate decision to offer Johnson a new but diminished position. Based upon these facts, we conclude that a jury could reasonably find that Newman played a significant role in Noyes's decisionmaking process.

Kroger also contends that Newman's concern about having an African-American comanager was an isolated statement that cannot support a finding of racial discrimination. *See id.* at 355 ("Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (internal quotation marks and citation omitted). But Newman's comment does not stand alone. Instead, the manner in which several employees observed him behave towards Johnson—behavior that was claimed to be distinct from his interaction with Caucasian comanagers—reinforces the possibility that Newman's comment might have reflected racial animus. *Id.* at 356 ("[W]hen assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.").

Newman's statement must also be viewed in connection with the evidence concerning racial jokes and slurs prior to Johnson's arrival at the Wheelersburg store. Kroger emphasizes that Newman did not listen to racial jokes, but instead told the department heads not to tell them, and that he never heard the racial slurs that other employees reportedly heard. A reasonable juror, however, could infer that Newman's awareness of racial jokes prior to Johnson's arrival at the store indicates that he harbored racially discriminatory views.

In addition to the evidence pertaining to the relationship between Johnson and Newman, the record is silent as to whether Noyes disciplined any employees at the Wheelersburg store other than Johnson. These employees admittedly were not similarly situated to Johnson because, with the exception of Newman, they did not have the same responsibilities or occupy managerial-level positions. But if Noyes blamed Johnson for the problems at the store without reprimanding other potentially blameworthy employees, this differential treatment, especially when viewed in conjunction with Newman's treatment of Johnson, would permit an inference that racially discriminatory views were the actual reason that Kroger terminated Johnson's employment.

This is admittedly a close case. We are of the opinion, however, that Johnson has presented sufficient evidence to enable a reasonable jury to conclude that Johnson would not have been discharged but for his race. Kroger, on the other hand, has produced substantial evidence that Johnson lost his job because he was not performing effectively. But the ultimate decision of whether Kroger's proffered reason for discharging Johnson was legitimate or only a pretext intended to hide racial discrimination is a matter for the jury to determine. Based upon the record before us, we are of the opinion that the issue cannot be decided as a matter of law.

We note, however, that the dissent has reached the opposite conclusion. Although well-written and carefully analyzed, we cannot agree with its assertions that "[t]here is not a shred of evidence" that Newman's conduct was racially motivated (Dissenting Op. at 28), and that "Newman provided no input into Noyes's decision beyond his ability to observe Johnson's day-to-day performance . . . ." (Dissenting Op. at 33). The record, we believe, is not "so one-sided that [Kroger] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In the end, this case comes down to a judgment call about whether Johnson presented enough evidence to create a genuine issue of material fact. Even the dissent acknowledges

explained that this form of pretext "is of an entirely different ilk" from the other two:

> There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

The majority holds that Johnson has produced sufficient evidence of such an unlawful "coverup" here, through a combination of two inferences that the majority finds permissible: (i) that Johnson's direct supervisor, Dan Newman, was motivated by racial animus, and (ii) that Newman played a significant role in Johnson's discharge. I find the evidence wanting on both of these points, and especially the latter. Thus, even if the trier of fact could conclude that Newman's treatment of Johnson was marred by racial bias, the record precludes any finding that this played a role in Kroger's discharge decision.

Regarding Newman's purported racial animus toward Johnson, my own review of the record leads me to a conclusion quite different from the one advanced by Johnson and accepted by the majority. The only allegedly race-based remarks that are attributed to Newman are: (i) his alleged statement that the forthcoming transfer of Johnson to Wheelersburg would hurt the store's business, because of the lack of African-American customers at this location; and (ii) his purported statements at a department head meeting just

account at his deposition, stating that he told Noyes that "if you wanted to continue with [Johnson] as he was, I could live with that." (Newman Dep. at 213-14, J.A. at 622-23.)

Noyes deemed Newman's proposal unacceptable, however, concluding that Johnson had been afforded a sufficient opportunity to correct his shortcomings and had failed to do so. Accordingly, when Johnson refused to accept a transfer, Noyes discharged him. This is the backdrop against which Johnson must produce sufficient evidence to permit an inference of race discrimination — a documented record of poor performance over many months as witnessed by a number of individuals, including the principal decisionmaker herself, and an employee's failure to overcome these deficiencies even after being specifically and repeatedly informed of them.

## II.

Kroger having proffered a legitimate, nondiscriminatory reason for its action, Johnson must show that Kroger's stated reason is a mere pretext for unlawful discrimination. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). As stated by the majority, we have characterized evidence of pretext as taking one of three forms. *See Dews*, 231 F.3d at 1021. The majority holds, and I agree, that Johnson cannot establish the first of these three forms of pretext — *i.e.,* that Kroger's proffered reason "has no basis in fact," *Dews*, 231 F.3d at 1021 — in light of the unrefuted documentary evidence of deficiencies in Johnson's job performance. The majority further concludes, and I again agree, that Johnson's appeal to the third type of pretext — *i.e.,* that Kroger's stated reason "was insufficient to warrant" Johnson's discharge, *Dews*, 231 F.3d at 1021 — fails for lack of evidence that any similarly-situated employee was treated more favorably despite comparable performance problems.

This leaves only the second method of establishing pretext, by offering evidence sufficient to permit the conclusion that Kroger's proffered reason "did not actually motivate" its discharge decision. *Dews*, 231 F.3d at 1021. We have

that there is "a scintilla of evidence" that Newman was racially biased. (Dissenting Op. at 34). We would simply point out that one judge's scintilla is another's genuine issue of material fact that requires consideration by a jury.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

---

**DISSENT**

---

ROSEN, District Judge, dissenting. My disagreement with the majority is a narrow but dispositive one. Specifically, I do not share the majority's view that the record before us permits the inference that Defendant/Appellee Kroger Company's legitimate, nondiscriminatory reason for terminating Plaintiff/Appellant Stanley Johnson was a pretext for race discrimination. Rather, I believe that the incidents cited by Johnson as supporting this inference are not suggestive of racial bias, are temporally far removed from Kroger's discharge decision, and, most importantly, have not been shown to have played any role in this decision. Thus, I respectfully dissent.

**I.**

Johnson acknowledges, and the majority recognizes, that Kroger has articulated a legitimate, nondiscriminatory reason for terminating Johnson's employment. Specifically, Kroger states that Johnson was discharged for poor job performance. Before turning to Johnson's claim that this reason is pretextual, I find it instructive to briefly summarize the significant body of evidence that supports Kroger's stated basis for its decision.

According to Kroger, zone manager Nancy Noyes made the decision to terminate Johnson, in consultation with Mike Purdum of Kroger's human resources department. Noyes testified that, in making this decision, she drew upon her own direct observation of Johnson's job performance during a series of walkthroughs, spanning from November of 1995 to late June of 1996, of the Wheelersburg store where Johnson served as comanager. Noyes also received input from members of her staff who had conducted additional inspections of the Wheelersburg store. As reflected in Noyes' testimony and the contemporaneous reports of her and her staff, these walkthroughs consistently revealed a number of problems while Johnson was in charge of the store, including failure to ensure the quality and appearance of meat and produce, lack of familiarity with Kroger's policies and accounting methods and the store's budget and sales figures, and unkempt conditions. Noyes discussed these problems with Johnson, but saw no improvement in these areas. Significantly, Johnson does not and cannot dispute these documented deficiencies in his job performance.

Apart from considering these shortcomings, both documented and directly observed, Noyes testified that she also received input from Mike Purdum of human resources and Johnson's direct supervisor, store manager Dan Newman. Noyes stated that she spoke to Purdum to ensure that every possible effort was being made to overcome Johnson's deficiencies or, failing that, to identify a job that might be better suited to his customer relations skills. Regarding Newman, Noyes testified that he was an additional source of information about Johnson's performance, with Newman's reports tending to confirm the direct assessments of Noyes and her staff. According to Noyes, Newman expressed frustration that Johnson's shortcomings might reflect poorly upon him as store manager, but Noyes urged Newman not to intervene, and instead to allow Johnson "the opportunity to follow through on his responsibilities." (Noyes Dep. at 93, J.A. at 658.)

Upon reviewing Johnson's employment record in the late summer or early fall of 1996 and discerning no improvement in his job performance, Noyes consulted with Purdum and decided to offer Johnson a transfer to a service director position. Noyes stated that she and Purdum made this decision, and that "[i]t was certainly not" Newman's decision to remove Johnson from his job as comanager. (Noyes Dep. at 165, J.A. at 675.) To the contrary, Noyes testified that when she advised Newman of her decision, Newman responded by asking whether "there was anything more he could do to help" Johnson in his existing position. (Noyes Dep. at 165-66, J.A. at 675-76.) Newman confirmed this