Coburn NEASON, Plaintiff,

v.

**GENERAL MOTORS CORP.,**
Defendant.

**No. CIV. 03–73141.**

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 14, 2005.

Lance W. Mason, Detroit, MI, for Plaintiff.

Gayle L. Landrum, Kay R. Butler, Hardy, Lewis, Birmingham, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. INTRODUCTION

Plaintiff Coburn Neason alleges race discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.;* Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101, *et seq.;* and 42 U.S.C. § 1981. Plaintiff is an hourly paid employee at Defendant General Motors Corp.'s Ypsilanti plant, and claims he was improperly denied work because of his race during two periods: (1) the plant's annual shut-down in July 2002; and (2) overtime on certain days between February and May 2003. Defendant moves for summary judgment on all counts, and for the reasons that follow, Defendant's motion is DENIED in its entirety.

### II. FACTUAL BACKGROUND

Plaintiff Coburn Neason, an African–American male and member of the United Auto Workers ("UAW"), is employed by Defendant General Motors Corp. ("GM") at its Ypsilanti plant. (Resp. at 2; Def.'s Mot. at 1–2.) Plaintiff, a furnace repairman, works in the plant's Furnace Repair—Heat Treat Maintenance department. (Def.'s Mot. at 2, 6; Resp. at 2–3.) Since 1984, Plaintiff has been subject to medical restrictions that allow him to perform only one job task without assistance. (Resp. at 2–3; Def.'s Mot. at 2–3, Pl.'s Dep. at 20, 64–65, 71, 88.) That task consists of checking the "dew point function," a measure of the gas/air mixture in the furnace. *Id.*

## A. July 2002 Plant Shut–Down

The Ypsilanti plant's annual shut-down occurred from July 1 through July 14, 2002. (Def.'s Mot. at 3; Resp. at 4.) On June 3, 2002, the plant posted a notice, stating that any hourly employee who wished to be considered for shut-down work was required to submit an application to the scheduling department before June 14, 2002, and late applications would be considered only if additional manpower was needed. (Def.'s Mot. at 4; citing Ex. 4; Pl.'s Dep. at 38.) Plaintiff received the notice and was aware of its requirements. (Def.'s Mot. at 4; citing Pl.'s Dep. at 38.)

In Plaintiff's deposition, he states that he mistakenly submitted an application declining temporary lay-off instead of an application requesting work during the plant shut-down. (Pl.'s Dep. at 36–37, 43–45.) Plaintiff testified that he told Michael Kwiatkowski in the GM scheduling department that he accidently turned in the wrong application. *Id.* Plaintiff testified that Kwiatkowski acknowledged Plaintiff's mistake and told Plaintiff he would still be scheduled to work during shut-down. *Id.* Plaintiff is uncertain when this conversation with Kwiatkowski occurred. (Pl.'s Dep. at 44–45.) Plaintiff turned in the application to work during shut-down, which was marked "late" (Def.'s Mot. at Ex. 5), and Plaintiff's testimony is unclear as to whether he believes it was in fact submitted late. (Pl.'s Dep. at 43, 53–54.)

Plaintiff asserts that on July 1, 2002, he arrived at the plant to work during shut-down, but was informed by co-workers that his name was not on the schedule.

(Pl.'s Dep. at 48, 66.) Plaintiff testified he then talked to Kwiatkowski, who told Plaintiff that Robert Doty made the decision not to schedule Plaintiff. *Id.* at 32–33, 50. Doty's title is "manufacturing planner," although he operates as the plant's general foreman. (Doty's Dep. at 19.) Plaintiff's UAW Committeeman, Larry Dillon, stated in his deposition that Plaintiff's name was on a letter to the UAW from GM management listing employees scheduled to work during shut-down.[1] (Resp. at 4; citing Dillon's Dep. at 10–12.) Dillon also testified that although Doty had influence over shut-down scheduling, Doty's boss, Rick Thackham, had final approval. (Dillon's Dep. at 45–47, 68.) Dillon said he knows Doty had influence because he was present during a discussion of shut-down scheduling between Doty, Thackham, and Mike Woods. *Id.* at 45–46. Doty testified that he had no role in deciding who would work during shut-down. (Doty's Dep. at 50.) Ultimately Plaintiff did not work during the July 2002 plant shutdown. (Resp. at 2; Def.'s Mot. at 8.)

Defendant offers two reasons why Plaintiff was not scheduled for shut-down work in July 2002. First, Defendant alleges that Plaintiff's application to work shut-down was turned in late. (Def.'s Mot. at 4; citing Kwiatkowski Aff. ¶ 7.) Late applications are only considered if additional manpower is needed, and because none was needed, Plaintiff was not scheduled for shut-down work. *Id.* at 4–5; citing Kwiatkowski Aff. ¶¶ 3, 9, 10. Second, the dew point function, which is the only job Plain-

---

1. Plaintiff's brief also quotes this testimony from Committeeman Dillon: "[Kwiatkowski in scheduling] told Mr. Doty no, he was wrong, and Mr. Doty said, 'We ain't going to follow your letter.' First time as me being a union rep that a general foreman overruled the scheduling department." (Resp. at 4; citing Dillon's Dep. at 10–12.) Evidence must be admissible to be considered by the court on summary judgment. Fed.R.Civ.P. 56(e); *Carter v. Univ. of Toledo,* 349 F.3d 269, 274 (6th Cir.2003); *Lucas v. Chance,* 121 Fed. Appx. 77, 79–80 (6th Cir.2005). This testimony is inadmissible because Plaintiff has not established Dillon's basis for knowledge of the alleged conversation between Kwiatkowski and Doty.

tiff is able to do without assistance, was not performed during shut-down. *Id.* at 5. However, Defendant's second reason is contradicted by Doty, who testified that there was in fact work for Plaintiff to do during shut-down. (Doty's Dep. at 51.)

### B. February—May 2003 Overtime

From February through May, 2003, Plaintiff applied several times for overtime work and was denied. (Resp. at 7; Def.'s Mot. at 7.) Defendant claims that Plaintiff was denied overtime because his medical restrictions precluded him from performing the scheduled tasks. (Def.'s Mot. at 7; citing DeBoer Aff. ¶ 5(e).) Plaintiff claims this is pretextual and he could have performed the overtime work. (Resp. at 7–8.) However, Plaintiff also testified that he is in fact offered overtime when the assignments include the dew point function, and when he is denied overtime, it is due to his medical restrictions. (Def.'s Mot. at 7; citing Pl.'s Dep. at 90–91.) Doty testified that he determines whether overtime needs to be worked on a given day. (Doty's Dep. at 84.) Doty said that supervisors select employees for overtime from an overtime equalization list, and those at the top of the list are offered work. *Id.* Both parties offer testimony that Mark Juracek was Plaintiff's immediate supervisor in 2003, and Doty was Juracek's supervisor. (Doty's Dep. at 35–36, 66; Dillon's Dep. at 23.) Doty testified that Juracek decided not to schedule Plaintiff for the challenged periods of overtime between February and May, 2003, and Doty concurred with Juracek's decision. (Doty's Dep. at 55–57.) Specifically, Doty said in his deposition:

Q: Were you ever consulted about whether [Plaintiff] should be scheduled for overtime or not?

A: I'm sure, yes.

Q: And what did you say?

A: If the work is outside of his restrictions he cannot work. [ . . . ]

Q: So what in [Plaintiff's] medical restrictions limited his ability to work overtime? [ . . . ]

A: Well, you know, I don't recall all of his restrictions, but when we looked at his restrictions and we looked at the work, he wasn't capable.

*Id.* at 57–58.[2]

### C. Plaintiff's Grievances

Through the UAW, Plaintiff filed several grievances: one protesting his loss of work during the July 2002 plant shut-down, and six protesting his loss of overtime from February through May 2003. (Def.'s Mot. at 8–9; citing Exs. 8–10.) All seven of Plaintiff's grievances were settled, and Plaintiff received payment for 160 hours of straight time. (Def.'s Mot. at 9; citing Ex. 10; Pl.'s Dep. at 93–94, 145.) Plaintiff and UAW Committeeman Dillon each testified that such payment fully compensated Plaintiff for lost wages attributable to the July 2002 shut-down and 2003 overtime periods at issue. (Def.'s Mot. at 9; citing Pl.'s Dep. at 95, 136–37, 143–45; Dillon's Dep. at 23, 60.)

### D. Alleged Discriminatory Statements Made by Robert Doty

UAW Committeeman Dillon represented Plaintiff on all seven grievances. (Dillon's Dep. at 22–24, 50.) Dillon testified that

---

**2.** Dillon also testified, "Every time [Juracek] would try to get [Plaintiff] to work [overtime], Bob Doty would tell [Juracek] that [Plaintiff] wasn't allowed to work due to his restrictions." (Dillon's Dep. at 23–24.) Neither Plaintiff's brief nor Dillon's deposition explains Dillon's basis for knowledge, so this statement cannot be considered on summary judgment. Fed.R.Civ.P. 56(e); *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir.2003); *Lucas v. Chance*, 121 Fed.Appx. 77, 79–80 (6th Cir.2005).

when he met with Doty to settle one of Plaintiff's grievances, Doty called Plaintiff a "useless nigger" four or five times during the 30 minute meeting. (Resp. at 6–7; citing Dillon's Dep. at 15–17.) Dillon testified that he asked Doty if Doty would pay Plaintiff's grievance if Plaintiff were white, and Doty replied that he would. *Id.* Doty testified that he never made those comments. (Doty's Dep. at 22–26, 45.) Dillon reported the alleged incident to Defendant's upper management. (Resp. at 7; citing Dillon's Dep. at 17–18.)

The date on which Doty allegedly made those statements is unclear. Plaintiff's brief does not give an exact date, but discusses the alleged incident in conjunction with Plaintiff's July 2002 shut-down grievance, citing Dillon's deposition. (Resp. at 4–7.) However, Dillon's deposition testimony does not provide a date either, and in fact suggests the statements might have been made in 2003 during one of Dillon's overtime grievance meetings with Doty. (Dillon's Dep. at 14, 18, 24–25.) In response to the Court's order for document production, Plaintiff submitted a GM internal memo, dated May 6, 2003, to Lolita Fortenberry from Mike DeBoer. (Pl.'s Resp. to Court's Order for Document Production, at 11.) The memo contains a time line of GM's investigation into the alleged incident between Doty and Dillon, indicating that Dillon accused Doty of a racial slur at a March 2003 meeting. *Id.*

## III. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the evidence and any inferences drawn from the evidence in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001).

The burden on the moving party is satisfied where there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The trial court has some discretion to determine whether the respondent's claim is plausible. *Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1087–88 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).

### B. Standard of Review Under Title VII and Michigan's Elliott–Larsen Civil Rights Act

#### 1. Plaintiff Must Allege an Adverse Employment Action

##### (a). Title VII

■ For a plaintiff's claim to be actionable under Title VII, the employment action complained of must amount to an "adverse employment action." *White v. Burlington Northern & Santa Fe Railway Co.,* 364 F.3d 789, 795–96 (6th Cir. 2004). An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct," and it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885–86 (6th Cir.1996).

■ Plaintiff challenges Defendant's decisions not to schedule him for work dur-

ing the plant's July 2002 shut-down, and for certain periods of overtime between February and March 2003. (Resp. at 2, 7, 10–11; Compl. ¶ 9.) These decisions are considered adverse employment actions under *White v. Burlington Northern,* 364 F.3d 789 (6th Cir.2004), *cert. granted,*[3] *Burlington Northern v. White,* — U.S. ——, 126 S.Ct. 797, 163 L.Ed.2d 626 (2005). In the present case, Plaintiff was denied shut-down and overtime work, and subsequently was compensated for those lost hours when his grievances were settled. (Resp. at 2, 7, 10–11; Pl.'s Dep. at 95, 136–37, 143–45). *White* involved similar facts: the plaintiff was suspended without pay for 37 days, and later, through the union grievance process, was reinstated with back pay. 364 F.3d at 794. The Sixth Circuit held that the *White* plaintiff had suffered an adverse employment action, and expressly joined the majority of other circuits in rejecting the "ultimate employment decision" standard. *Id.* at 800–03. That standard made only permanent decisions by employers, such as hiring or firing, actionable under Title VII. *Id.* Thus, despite the fact that Plaintiff was already compensated for lost wages related to the time periods at issue, Plaintiff

has shown an adverse employment action under Title VII.[4]

*(b). Michigan's Elliott–Larsen Civil Rights Act*

■ The Michigan Supreme Court also requires a plaintiff to show an adverse employment action under the Elliott–Larsen Civil Rights Act ("Elliott–Larsen"). *Sniecinski v. Blue Cross and Blue Shield of Mich.,* 469 Mich. 124, 134–35, 666 N.W.2d 186 (2003). While the Sixth Circuit rejected the "ultimate employment decision" standard for Title VII claims, it is uncertain whether the standard would apply to Elliott–Larsen claims. Neither the Sixth Circuit nor the Michigan Supreme Court has spoken on the question as to whether a challenged employment decision must be permanent in order to be actionable under Elliott–Larsen, and decisions by the Michigan Court of Appeals are in conflict. Some Michigan Court of Appeals cases did not require a permanent employment decision,[5] while other cases did.[6]

In the absence of Michigan Supreme Court precedent, federal courts are bound by the decisions of the intermediate state courts, absent "other persuasive data that the highest court of the state would decide

---

3. Such review may be dispositive as to the applicability of the adverse employment action claimed by Plaintiff in this case.

4. Defendant argues that this is not an adverse employment action, relying on *Dobbs–Weinstein v. Vanderbilt Univ.,* 185 F.3d 542 (6th Cir.1999). *Dobbs–Weinstein* held that the plaintiff had not suffered an adverse employment action because although initially she was denied university tenure, later she was granted tenure and back pay. *Id.* at 546. But the court in *White* expressly limited *Dobbs–Weinstein,* recognizing that it was "based in part upon the unique nature of tenure decisions in an academic setting." *Id.* at 802 n. 7. The *White* court noted, "Because we are not presented here with a denial of tenure, we do not decide to what extent our holding in *Dobbs–Weinstein* survives our deci-

sion in this case." *Id.* Thus, Defendant's reliance on *Dobbs–Weinstein* in this case is misguided; the *White* decision is controlling.

5. See, e.g., *Mick v. Lake Orion Cmty. Schs.,* 2004 WL 1231944, *7 n. 9, 2004 Mich.App. LEXIS 1400, 21 n. 9 (June 3, 2004); *Hager v. Warren Consol. Schs.,* 2002 WL 44411, *11, 2002 Mich.App. LEXIS 8, *38–39 (Jan. 8, 2002); *Meyer v. City of Center Line,* 242 Mich. App. 560, 570–71, 619 N.W.2d 182 (Sept. 15, 2000).

6. See, e.g., *Henning v. Wireless,* 2005 WL 155498, *2, 2005 Mich.App. LEXIS 168, *5 (Jan. 25, 2005); *Kupel v. GM,* 2003 WL 21398292, *1, 2003 Mich.App. LEXIS 1428, *3 (June 17, 2003); *Pena v. Ingham County Rd. Comm'n,* 255 Mich.App. 299, 311, 660 N.W.2d 351 (2003).

otherwise." *Hampton v. United States,* 191 F.3d 695, 701–02 (6th Cir.1999) (citations omitted). When state law is unsettled, it is the job of the federal court to predict how the state's highest court would rule on the issue. *Mills v. GAF Corp.,* 20 F.3d 678, 681 (6th Cir.1994). Michigan state courts have described the Elliott–Larsen Act as remedial in nature, and said it should be construed liberally to provide a broad remedy. *Kassab v. Mich. Basic Prop. Ins. Ass'n,* 441 Mich. 433, 441 n. 11, 491 N.W.2d 545 (1992) (citations omitted); *Neal v. Dep't of Corrs.,* 230 Mich.App. 202, 207, 583 N.W.2d 249 (1998). While Michigan courts are not bound by Title VII precedent when interpreting similar provisions of the Elliott–Larsen Act, those precedents are highly persuasive and may be afforded substantial consideration. *Barrett v. Kirtland Cmty. Coll.,* 245 Mich.App. 306, 628 N.W.2d 63 (2001); *Cole v. General Motors Corp.,* 236 Mich.App. 452, 600 N.W.2d 421 (1999).

In the interest of providing a broad remedy, and in consideration of the weight of Title VII precedent, it is likely that the Michigan Supreme Court would reject the "ultimate employment decision" standard for Elliott–Larsen claims. The majority of federal circuits have rejected such a standard for Title VII claims. *White,* 364 F.3d at 801. Moreover, a standard that recognizes as actionable intermediate employment decisions, such as suspension with later reinstatement, provides a far broader remedy than a standard limited only to permanent employment actions. In consideration of this, Plaintiff has asserted an adverse employment action under the Elliott–Larsen Act.

### 2. *Direct Evidence of Race Discrimination*

#### (a). *Title VII*

To establish a claim under Title VII, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir.2003). Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods., Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). Direct evidence "does not require the factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).

Plaintiff offers the following as direct evidence of discrimination: (1) UAW Committeeman Dillon's deposition testimony that Doty called Plaintiff a "useless nigger" several times during a grievance settlement meeting between Dillon and Doty; and (2) Dillon's testimony that, during the same meeting, Dillon asked Doty if Doty would pay Plaintiff's grievance if Plaintiff were white, and Doty replied that he would. (Resp. at 6–7; citing Dillon's Dep. at 15–17.) Doty denies making either comment. (Doty's Dep. at 22–26, 45.) In assessing a direct evidence claim, the Sixth Circuit considers the extent to which the speaker of the allegedly discriminatory remarks was involved in the challenged employment decision. *See DiCarlo v. Potter,* 358 F.3d 408 (6th Cir.2004); *Wexler v. White's Fine Furniture,* 317 F.3d 564 (6th Cir.2003); *Hein v. All America Plywood Co.,* 232 F.3d 482 (6th Cir.2000); *Wells v. New Cherokee Corp.,* 58 F.3d 233 (6th Cir.1995). Additionally, the evidence must demonstrate not only that the employer was predisposed to discriminate on the basis of race, but that the employer acted on that predisposition. *DiCarlo,* 358 F.3d at 415; *Hein,* 232 F.3d at 488.

### (i). Was Doty a Decision–Maker?

In determining whether an alleged discriminatory remark is relevant, a court must first examine the speaker's identity. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir.1998). Remarks made by a person with no managerial authority over the challenged employment decision are not relevant. *Johnson*, 319 F.3d at 868. However, "courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee." *Wells*, 58 F.3d at 238. At the summary judgment stage, a court must determine "whether a reasonable jury could conclude that [the speaker] was in a position to influence" the challenged employment decision. *Ercegovich*, 154 F.3d at 355.

Plaintiff has raised an issue of material fact as to whether Doty was meaningfully involved in the decision not to schedule Plaintiff for work during the July 2002 plant shut-down. At two separate points in his deposition, Plaintiff testified that Mike Kwiatkowski in the GM scheduling department told Plaintiff that Doty made the decision not to schedule Plaintiff for shut-down.[7] (Pl.'s Dep. at 32–33, 50.) This is evidence that Doty himself was the final decision-maker on whether Plaintiff would work shut-down. Dillon testified that Doty had influence over shut-down scheduling, and Doty's boss, Rick Thackham, had final approval.[8] (Dillon's Dep. at 45–47, 68.) Dillon said he knows Doty had influence because he was present during a discussion of shut-down scheduling between Doty, Thackham, and Mike Woods. *Id.* at 45–46. Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could conclude that Doty himself was the decision-maker or was meaningfully involved in the decision not to schedule Plaintiff for the July 2002 shut-down.

Plaintiff's evidence of Doty's involvement in the February through May 2003 overtime scheduling decisions is also sufficient to withstand summary judgment, although it is a closer call than the July 2002 shut-down decision. In *Ercegovich v. Goodyear Tire & Rubber Co.*, a vice president allegedly made discriminatory comments suggesting that he did not want older employees working in his division. 154 F.3d 344, 354 (6th Cir.1998). The vice president did not make the final decision to eliminate the plaintiff's job position, but a manager testified that the vice president "was involved in some parts of the discussion." *Id.* at 355. The court held that an issue of material fact existed as to whether the vice president was meaningfully involved in the decision. *Id.* The court reasoned that as head of the division, the vice president was in a position to shape the attitudes and decisions of lower-level managers, such as the manager who decided to eliminate the plaintiff's job. *Id.*

*Ercegovich* is instructive in the present case because Plaintiff offers evidence that, although Doty did not make the final decision on scheduling Plaintiff for 2003 overtime, Doty was in a position of authority over the decision-maker, Mark Juracek. Doty testified that Juracek made the final

---

**7.** Defendant erroneously claims this is inadmissible hearsay. (Reply at 2 n. 2.) It is an admission by a party-opponent, and thus exempt from hearsay treatment. *See* Fed. R.Evid. 801(d)(2)(D).

**8.** Defendant argues that Michael DeBoer, Senior Labor Relations Representative for GM, was the final decision-maker because DeBoer settled Plaintiff's grievances. (Reply at 4; citing DeBoer Aff.) But Plaintiff's action is based on the denial of shut-down and overtime work, not the initial failure to settle his grievances. *See* Compl. ¶¶ 5, 6, 9, 14; Resp. at 2, 7, 10–11. Defendant offers no evidence that DeBoer was at all involved in the challenged scheduling decisions, and thus he is not a relevant decision-maker.

decision, but Doty was consulted and concurred in Juracek's decision. (Doty's Dep. at 55–58.) Doty testified:

Q: Were you ever consulted about whether [Plaintiff] should be scheduled for overtime or not?

A: I'm sure, yes.

Q: And what did you say?

A: If the work is outside of his restrictions he cannot work. [...]

Q: So what in [Plaintiff's] medical restrictions limited his ability to work overtime? [...]

A: Well, you know, I don't recall all of his restrictions, but when we looked at his restrictions and we looked at the work, he wasn't capable.

*Id.* at 57–58. This suggests that, at the very least, he and Juracek together considered whether Plaintiff could work given his physical limitations. Moreover, Plaintiff offers testimony from Doty and Dillon that Doty was Juracek's supervisor. (Doty's Dep. at 35–36, 66; Dillon's Dep. at 23.) A superior's discriminatory animus may influence the subordinate decision-maker by virtue of the superior's position of authority, even where the superior's involvement in the decision-making process is limited. *See Ercegovich,* 154 F.3d at 355.

Defendant argues that Doty cannot be considered a decision-maker, relying on a recent unpublished Sixth Circuit decision, *Vredevelt v. GEO Group,* 145 Fed.Appx. 122, 2005 WL 1869607 (6th Cir.2005). (Reply at 3–4.) In *Vredevelt,* a deputy warden who chaired a panel tasked with interviewing candidates for promotion allegedly said he would never promote a woman. *Id.* at 25–26, 43. The warden made the final decision on promotions, and the court held that the deputy's alleged discriminatory animus could not be attributed to the war-

den because no evidence existed that the warden adopted the deputy's assessment of the candidates. *Id.* at 26.

*Vredevelt* can be distinguished from the case at hand because it questioned when a subordinate's discriminatory animus may be imputed to a superior, whereas Plaintiff's case involves the converse scenario. In cases where discriminatory remarks are made by a subordinate employee, the Sixth Circuit has looked for evidence that the decision-maker relied upon or adopted the subordinate's recommendation. *See, e.g., Harris v. Giant Eagle,* 133 Fed.Appx. 288 (6th Cir.2005); *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715 (6th Cir.2004); *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862 (6th Cir.2001). But the instant case is more like *Ercegovich,* where the court recognized that a supervisor's position is inherently influential and did not require the plaintiff to show that the decision-maker in fact relied upon his superior's assessment. Viewing the evidence in a light most favorable to Plaintiff, an issue of material fact exists as to whether Doty was meaningfully involved in the decision not to schedule Plaintiff for the challenged periods of overtime from February through May 2003.

*(ii). Predisposition to Discriminate*

■ The evidence must also demonstrate a discriminatory predisposition on the employer's part. *DiCarlo,* 358 F.3d at 415; *Hein,* 232 F.3d at 488. A court must consider the substance of the alleged discriminatory remarks; isolated or ambiguous comments are insufficient to support a direct evidence claim of employment discrimination. *Weigel v. Baptist Hosp.,* 302 F.3d 367, 382 (6th Cir.2002). Plaintiff submits the testimony of UAW Committeeman Dillon that Doty called Plaintiff a "useless nigger" several times during a

meeting and said he would pay Plaintiff's grievance if Plaintiff were white. (Resp. at 6–7; citing Dillon's Dep. at 15–17.) Doty denies making the comments, but on summary judgment, all contested facts must be assumed in favor of the non-moving party. These alleged remarks clearly are not ambiguous, nor could they be construed as innocuous. *See Hopkins v. Elec. Data Systems Corp.,* 196 F.3d 655, 661 (6th Cir.1999) (finding that a reference to "the mentally ill guy on Prozac that's going to shoot the place up" was ambiguous). Assuming in Plaintiff's favor that the comments were made by a decision-maker at a meeting affecting Plaintiff's employment, the comments were not isolated remarks. Thus, Plaintiff has offered evidence sufficient to withstand summary judgment regarding the issue of Defendant's discriminatory predisposition.

### (iii). Action Based on Discriminatory Predisposition

"The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein,* 232 F.3d at 488; *DiCarlo,* 358 F.3d at 415. Plaintiff has offered evidence sufficient to raise an issue of material fact as to whether the challenged employment decisions were motivated by a discriminatory animus. UAW Committeeman Dillon testified that during a grievance settlement meeting, Doty called Plaintiff a "useless nigger" several times and said he would pay Plaintiff's grievance if Plaintiff were white. (Dillon's Dep. at 15–17.) These grievances were based on the fact that Plaintiff was not scheduled for July 2002 shut-down work and certain overtime work in 2003. Thus, a strong nexus exists between Doty's alleged discriminatory statements and

Doty's alleged involvement in the shutdown and overtime scheduling decisions.

In addressing the issue of causation, the Sixth Circuit has considered the temporal proximity between alleged discriminatory remarks and a challenged employment decision. *See, e.g., DiCarlo,* 358 F.3d at 417; *Wexler v. White's Fine Furniture,* 317 F.3d 564 (6th Cir.2003). Neither Plaintiff's brief nor the attached depositions specify exactly when Doty allegedly made the discriminatory remarks. Based on the dates of Plaintiff's grievances, it could have been either shortly after July 2002 or sometime between February and May 2003. (Def.'s Mot. at Exs. 8–10.) Despite this, the strength of Doty's alleged comments creates an issue of material fact as to causation, regardless of when he allegedly made those comments. Doty allegedly said that but for Plaintiff's race, he would have made a different decision on Plaintiff's grievance. Coupled with the alleged racial slur, this is strong evidence of causation. It distinguishes the instant case from other Sixth Circuit decisions where the "but for" causal link was not as strong, and the court relied upon other circumstantial evidence (such as when the discriminatory statements were made) to address the causation issue. *Cf. DiCarlo,* 358 F.3d 408 ("the temporal proximity between the discriminatory act and the termination creates a far different scenario, such that causation may be demonstrated with a *lesser quantum of evidence* than in other cases not involving such a tight time line of events.") (emphasis added).

In summary, a genuine issue of material fact exists regarding Doty's involvement in the challenged scheduling decisions, Defendant's discriminatory predisposition, and whether Defendant acted on that predisposition. Therefore, Defendant's Motion for Summary Judgment on Plaintiff's Title VII claim is DENIED.

*(b). Michigan's Elliott–Larsen Civil Rights Act*

██ Michigan courts apply the same Title VII standards to direct evidence claims under the Elliott–Larsen Act. *Shefferly v. Health Alliance Plan of Mich.*, 94 Fed. Appx. 275, 280–81 (6th Cir.2004) (citing *Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich.App. 289, 624 N.W.2d 212 (2001)). Based on the preceding Title VII analysis, Defendant's Motion for Summary Judgment on Plaintiff's Elliott–Larsen Act claim is DENIED.

## C. Standard of Review Under 42 U.S.C. § 1981

"The elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir.2004). In light of the prior discussion of Plaintiff's Title VII claim, Defendant's Motion for Summary Judgment on Plaintiff's § 1981 claim is DENIED.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED in its entirety.

**IT IS SO ORDERED.**